## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                          )
AMERICAN INSTITUTE FOR INTERNATIONAL      )
STEEL, INC., SIM-TEX, LP, and KURT ORBAN  )
PARTNERS, LLC,                            )
                                          )
              Plaintiffs,                 )        Court No. 18-00152
      v.                                  )
                                          )
UNITED STATES and KEVIN K. MCALEENAN,     )
Commissioner, United States Customs and   )
Border Protection,                        )
                                          )
              Defendants.                 )
_____ )
```

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to U.S. Court of International Trade Rule 56 and on the grounds set forth in the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment and the Statement of Undisputed Facts annexed hereto, Plaintiffs the American Institute for International Steel, Inc., Sim-Tex, LP, and Kurt Orban Partners, LLC hereby move that this Court:

a. Enter an order granting summary judgment in favor of Plaintiffs in this action;

b. Enter a declaratory judgment that section 232 and Proclamation 9705, together with the subsequent amendments to it, are unconstitutional as a violation of Article I, section 1 of the Constitution and the doctrine of separation of powers and the system of checks and balances that the Constitution protects;

c. Permanently enjoin the defendants from enforcing Proclamation 9705 and the subsequent amendments to it; and

e. Grant such other and further relief as may be just and proper.

11924414 v1

Respectfully submitted,

/s/Donald B. Cameron
Donald B. Cameron
R. Will Planert
Julie C. Mendoza
Brady W. Mills
MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811
dcameron@mmmlaw.com

/s/Alan B. Morrison
Alan B. Morrison
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

/s/Gary N. Horlick
Gary N. Horlick
Law Offices of Gary N. Horlick
1330 Connecticut Ave., NW, Suite 499c
Washington, D.C. 20036
(202) 429-4790
gary.horlick@ghorlick.com

/s/Timothy Meyer
Timothy Meyer
Vanderbilt Law School
131 21st Avenue South
Nashville, TN 37203
(615) 936-8394
tim.meyer@law.vanderbilt.edu

s/Steve Charnovitz
Steve Charnovitz
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7808
scharnovitz@law.gwu.edu

Dated: July 19, 2018

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, and KURT ORBAN PARTNERS, LLC, ) ) ) ) | |
| Plaintiffs, ) | Court No. 18-00152 |
| v. ) | |
| ) | |
| UNITED STATES and KEVIN K. MCALEENAN, ) Commissioner, United States Customs and ) Border Protection, ) | |
| ) | |
| Defendants. ) | |

### ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment and all responses thereto, it is hereby:

ORDERED that Plaintiffs' Motion for Summary Judgment is GRANTED; and it is further

ORDERED that section 232 and Proclamation 9705 are hereby declared unconstitutional as in violation of Article I, section 1 of the Constitution of the United States and the doctrine of separation of powers provided for therein; and it is further

ORDERED that defendants are hereby permanently enjoined from enforcing Proclamation 9705 and the subsequent amendments thereto.

SO ORDERED.

_____
Judge

Dated: _____

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, and KURT ORBAN PARTNERS, LLC,<br><br>    Plaintiffs,<br>  v.<br><br>UNITED STATES and KEVIN K. MCALEENAN, Commissioner, United States Customs and Border Protection,<br><br>    Defendants. | Court No. 18-00152 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Alan B. Morrison
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

Donald B. Cameron
R. Will Planert
Julie C. Mendoza
Brady W. Mills
MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811
dcameron@mmmlaw.com

Gary N. Horlick
Law Offices of Gary N. Horlick
1330 Connecticut Ave. NW, Suite 499c
Washington, D.C. 20036
(202) 429-4790
gary.horlick@ghorlick.com

Timothy Meyer
Vanderbilt Law School
131 21st Avenue South
Nashville, TN 37203
(615) 936-8394
tim.meyer@law.vanderbilt.edu

Steve Charnovitz
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7808
scharnovitz@law.gwu.edu

July 19, 2018

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

QUESTION PRESENTED ........................................................................................................ 4

STATEMENT OF THE CASE .................................................................................................. 5

    A.  OPERATION OF SECTION 232 .................................................................................... 5

    B.  THE PRESIDENT'S 25% TARIFF ................................................................................. 9

    C.  THIS ACTION ............................................................................................................. 13

ARGUMENT ......................................................................................................................... 16

    SECTION 232 IS UNCONSTITUTIONAL AS AN IMPROPER DELEGATION OF
    LEGISLATIVE AUTHORITY AND A VIOLATION OF SEPARATION OF POWERS ... 16

    1.  Section 232 Lacks Intelligible Principles and Other Protections Necessary to Assure that
        the President Executes the Law and Does Not Make the Law. ........................................ 18

    2.  Relevant Court Decisions Support Plaintiffs ................................................................. 28

CONCLUSION ...................................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)...................................................................................28

*Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO v.*
  *Connally*,
  337 F. Supp. 737 (D.D.C. 1971)................................................................30

*Clinton v. City of New York*,
  524 U.S. 417 (1998)...............................................................................4, 40

*Dalton v. Specter*,
  511 U.S. 462 (1994).......................................................................26, 27, 30

*Federal Energy Administration v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976)......................................................................... *passim*

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).......................................................................26, 27, 30

*Gundy v. United States*,
  138 S. Ct. 1260 (2018)...............................................................................28

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004)...................................................................................16

*Indus. Union Dept. AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)...................................................................................31

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928)...............................................................................3, 16

*Mistretta v. United States*,
  488 U.S. 361 (1989)......................................................................... *passim*

*Panama Refining Company v. Ryan*,
  293 U.S. 388 (1935)...................................................................................28

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018).........................................................................41, 42

*Severstal Exp. GmBH v. United States*,
  2018 WL 1705298 (Ct. Intl. Trade 2018) ..................................................9

*Severstal Export GMBH v. United States*,
　No. 18-00057 (Ct. Int'l Trade 2018) ............................................................9, 27

*Skinner v. Mid-America Pipeline Co.*,
　490 U.S. 212 (1989) ...........................................................................................30

*Star-Kist Foods, Inc. v. United States*,
　275 F.2d 472 (C.C.P.A. 1959) ...........................................................................41

*Touby v. United States*,
　500 U.S. 160 (1991) .......................................................................................30, 31

*Whitman v. American Trucking Associations, Inc.*,
　531 U.S. 457 (2001) ................................................................................. *passim*

*Yakus v. United States*,
　321 U.S. 414 (1944) .......................................................................................27, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952) ...........................................................................................17

*Zivotofsky v. Kerry*,
　135 S. Ct. 2076 (2015) .......................................................................................28

**U.S. Constitution**

U.S. Const., art. I, § 1 ............................................................................1, 4, 17, 28

U.S. Const., art. I, § 8 ..........................................................................................3, 5

U.S. Const., art. I, § 7 ...........................................................................................39

U.S. Const., art. II, § 3 .........................................................................................17

**Statutes**

5 U.S.C. § 551 ......................................................................................................24

5 U.S.C. § 553 ......................................................................................................24

5 U.S.C. § 706 ........................................................................................................8

18 U.S.C. § 3551 ..................................................................................................34

19 U.S.C. § 1862 ...................................................................................... *passim*

19 U.S.C. § 1862(b) .....................................................................................3, 5, 19

19 U.S.C. § 1862(c) ................................................................................... *passim*

19 U.S.C. § 1862(d) ................................................................................................ *passim*

28 U.S.C. § 991 ...................................................................................................... 34

28 U.S.C. § 1361 .................................................................................................... 27

28 U.S.C. § 1581(i)(2) ........................................................................................... 13

28 U.S.C. § 1581(i)(4) ........................................................................................... 13

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ........................................... *passim*

Clean Air Act, 42 U.S.C § 7401 *et seq.* ................................................................. 37

Controlled Substances Act, 21 U.S.C. § 801 *et seq.* .............................................. 30

Line Item Veto Act ............................................................................................. 4, 39, 40

Sex Offender Registration and Notification Act, 34 U.S.C. § 20901 *et seq.* ................ 28

Trade Expansion Act of 1962, 19 U.S.C. § 1862 .................................................. 1, 4

**Regulations**

15 C.F.R. § 705, Supp. 1 ........................................................................................ 11

**Other Authorities**

Executive Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ...................... 8, 25

THE FEDERALIST NO. 47 ........................................................................................ 17

Heather Long, *Trump has officially put more tariffs on U.S. allies than on China*,
   WASH. POST, June 1, 2018 ............................................................................... 12

Jacob M. Schlesinger & Bob Davis, *Commerce Secretary Ross:  Trade 'National
   Security' Probes Could Extend to Semiconductors, Aluminum*, DOW JONES,
   Apr. 25, 2017 .................................................................................................. 10

Mark Niquette, *Trump's Metal Tariffs Have Yielded More than $774 Million*,
   BLOOMBERG, June 21, 2018 ............................................................................ 13

Press Release, *U.S. Department of Commerce Initiates Section 232 Investigation
   into Auto Imports*, U.S. DEPT. OF COMMERCE (May 23, 2018) ......................... 10

Press Release, *U.S. Department of Commerce Initiates Section 232 Investigation
   into Uranium Imports*, U.S. DEP'T OF COMMERCE (July 18, 2018) ................... 10

Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 8, 2018) ............................... 10

Proclamation No. 9705, 83 Fed. Reg. 11,625 (Mar. 8, 2018)......................................10, 11, 12, 42

Rachel F. Fefer et al., Cong. Research Serv., R45249, Section 232
    Investigations: Overview and Issues for Congress (2018)............................................11

U.S. Dep't of Commerce, *The Effect of Imports of Aluminum on the National
    Security* (Jan. 17, 2018) ...................................................................................................10

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

```
                                        )
AMERICAN INSTITUTE FOR INTERNATIONAL)
STEEL, INC., SIM-TEX, LP, and KURT ORBAN )
PARTNERS, LLC,                          )
                                        )
            Plaintiffs,                 )      Court No. 18-00152
      v.                                )
                                        )
UNITED STATES and KEVIN K. MCALEENAN,   )
Commissioner, United States Customs and )
Border Protection,                      )
                                        )
            Defendants.                 )
                                        )
```

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This is an action seeking a declaratory judgment and an injunction against the enforcement of section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("section 232"), on the ground that it constitutes an improper delegation of legislative authority to the President, in violation of Article I, section 1 of the Constitution and the doctrine of separation of powers and the system of checks and balances that the Constitution protects.  The specific claim before this Court arises from the actions of the President, through proclamations issued under section 232, in which he imposed a 25% *ad valorem* tariff on steel products imported into the United States from most, but not all, countries ("the 25% tariff").

As a facial challenge to section 232, this case should be decided on cross-motions for summary judgment.  To demonstrate the injuries caused them by section 232 and the 25% tariff, Plaintiffs have submitted the declarations of Richard Chriss, President of Plaintiff American Institute for International Steel, Inc. ("AIIS"); John Foster, President of Plaintiff Kurt Orban

Partners, LLC ("Orban"); and Charles Scianna, President of Plaintiff Sim-Tex, LP ("Sim-Tex"). In further support of their motion, Plaintiffs cite to the four proclamations of the President that imposed the 25% tariff and then modified the countries whose steel products are subject to it, as well as to the procedures that the Secretary of Commerce (the "Secretary") issued to respond to individual requests by U.S. companies for product-specific exclusions from the 25% tariff.

Finally, this memorandum includes citations to the Steel Report prepared by the Secretary in support of his finding for the President that steel imports may threaten to impair the national security, as that term is broadly defined in section 232.  Included as an appendix to the Steel Report are the written statements submitted by 37 witnesses who testified before the Department of Commerce ("Commerce") on May 24, 2017.  The Steel Report also contains a link to the written statements submitted by more than 200 other interested persons to the Secretary for his consideration, some of which will also be cited herein.  The citations to these statements are not to establish the truth of what they assert, but to establish the many ways that those who rely on imported steel in their businesses informed Commerce that the tariffs would affect them.  Those statements are significant because they are the kind of effects that a 25% steel tariff would be expected to produce, and yet, most pertinent to this challenge, section 232 does not (a) require the President to take them into account in selecting the means to respond to the perceived threat that imported steel products may impair the national security, (b) forbid him from taking them into account, (c) forbid him to take some into account, but not others; or most importantly (d) provide him with any guidance on whether and how to take these factors into account.

This case challenges the constitutionality of section 232 because Congress has essentially turned over to the President the constitutional authority "[t]o lay and collect [t]axes, [d]uties, [i]mposts and [e]xcises," expressly given in Article I, section 8 of the Constitution to Congress. U.S. CONST., art. 1, § 8, cl. 1. Section 232 does that without providing the kind of "intelligible principle" required by the Supreme Court in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), to satisfy the nondelegation doctrine and the mandate of Article I that the legislature, not the President, make the laws.

Section 232, like most statutes challenged on nondelegation grounds, has two components, each of which must contain an intelligible principle to guide its application. First, there is a trigger, which is the finding needed to make the statute operative, in this case a conclusion that imports may "threaten to impair the national security." 19 U.S.C. § 1862(b)(3)(A). Second, once the trigger has been found, the statute gives the designated official the authority to select the remedies (or means of implementation). Specifically, section 232 allows the President, in his unbridled discretion, to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the [imported] article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). As we describe below, section 232 provides no restraints that limit the President's invoking the trigger or in his choice of remedies—tariffs, quotas, or something else—in what amounts, as applied to which products, and to which countries.

In essence, in section 232 Congress has transferred to the President the ability to make the essential policy choices that the Constitution assigns to Congress and Congress is required to retain under our Constitution and the principles of separation of powers that animate it. For that

reason, section 232 is like the Line Item Veto Act, which was condemned by the Supreme Court in *Clinton v. City of New York*, 524 U.S. 417 (1998), because that Act purported to permit the President to use the "cancellation" process in that Act to reject the policy choices made by Congress in the parts of a law that he "canceled."  To be sure, the Court in *Clinton* did not rely on the nondelegation doctrine on which Plaintiffs rely here, but the structural flaw of presidential versus congressional lawmaking is present in both.

There is another aspect of section 232 that reinforces the conclusion that it is unconstitutional.  When today so much of the power to implement the laws has been assigned to the President or administrative agencies, Congress has provided important checks on their use of those powers to assure that the laws are carried out as Congress provided.  But section 232 contains none of the procedural safeguards found in rulemakings governed by the Administrative Procedure Act.  Moreover, section 232 has no provision for judicial review, and because discretionary decisions like that imposing the 25% tariff here are made by the President, they are not subject to judicial review under the Administrative Procedure Act.  The result is that Congress created an unconstitutional regime in section 232, in which there are essentially no limits or guidelines on the trigger or the remedies available to the President, and no alternative protections to assure that the President stays within the law, instead of making the law himself.

## QUESTION PRESENTED

Is section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("section 232"), unconstitutional on the ground that it lacks an intelligible principle and therefore constitutes an improper delegation of legislative authority to the President, in violation of Article I, section 1 of the Constitution and the doctrine of separation of powers and the system of checks and balances that the Constitution protects?

## <u>STATEMENT OF THE CASE</u>

### A.    OPERATION OF SECTION 232

Section 232 was enacted pursuant to the power granted exclusively to Congress in Article I, section 8 of the Constitution "[t]o lay and collect [t]axes, [d]uties, [i]mposts and [e]xcises" as well as its authority "[t]o regulate [c]ommerce with foreign [n]ations . . . ."  U.S. CONST., art. I, § 8, cl. 1, 3.  Section 232(b) directs the Secretary on the application of any department or agency, the request of an interested party, or on his own motion, to undertake an investigation to determine the effects of imports of a particular article of commerce on the national security. After following certain procedural steps, and within 270 days of initiating the investigation, the Secretary is required to submit a report to the President, which includes his findings on whether that "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," and his recommendations for action by the President.  19 U.S.C. § 1862(b)(3)(A).  Under section 232(c), the President has 90 days to determine whether to concur with the findings of the Secretary, and if he concurs, to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of [that] article and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A)(ii).

Although the determination by the Secretary under section 232(b) and the President's action under section 232(c) are tied to "national security," section 232(d) includes an essentially unlimited definition of national security—one that departs from an ordinary understanding of national security as related to national defense and foreign relations—and directions as to how that term is to be applied:

> the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of

individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).  Because section 232(d) allows the Secretary and the President to consider, in essence, anything in the Nation's economy that imports might affect, there is nothing that the President is required to take into account, nor anything that he may not take into account, in determining whether the national security, as elastically defined, may be impaired by the imports of the subject article.

Moreover, section 232 provides no limit or guidance on which import adjustments he may impose to remedy the threat he identifies pursuant to section 232(d)'s unbounded definition of national security.  The President has an unlimited menu of options that he may employ.  These include imposing tariffs on goods that are currently duty-free and increasing tariffs above those currently existing under the law for the subject article—with no limit on the level of the tariff. Thus, section 232 permits the President to impose tariffs—taxes—in unlimited amounts and of unlimited duration on any imported articles—or, as in the case with the steel tariff, on an entire class of imported articles. The President may also impose quotas—whether or not there are existing quotas—and with no limit on how much a reduction from an existing quota (or present or historical level of imports) there can be for the subject article.  In addition, the President could choose to impose licensing fees for the subject article, either in lieu of or in addition to any tariff or quota already in place.  Conversely, the President may also reduce an existing tariff or increase a quota, whenever he concludes that such a reduction or increase is in the interest of national security, as elastically defined.  And for all these changes in the law, the President may select the duration of each such change without any limits on his choice, and he may make any changes with no advance notice or delay in implementation.

6

Under section 232(c), the President has a virtually unlimited range of other choices in determining what adjustments to imports he wishes to make, with no guidance from Congress as to how to make them. For instance, there is no requirement in section 232 that the President treat imports from all countries on a non-discriminatory basis with regard to such matters as the amount of the tariff or level of quota to be imposed, nor any guidance on whether to exempt some countries, or segments of any industry, but not others from an otherwise applicable tariff or quota. Similarly, although the imported articles may vary widely in their uses, quality, specifications, availability in the United States, and relation to national security—as they do for imported steel, *see infra* at 21—the President is permitted to disregard those differences, or take them into account, in his unfettered discretion.

There is also no requirement that the President must, or must not, take into account adverse consequences from a proposed tariff, although he may, if he chooses, do so for any or all such consequences. Anticipated consequences include: (1) raising the prices of domestic products made by using the imported article; (2) causing workers outside the domestic industry of the subject article to lose their jobs or work fewer hours; (3) favoring imported finished products that contain the imported article and that can be sold at lower prices in the United States because the tariff does not apply to them; (4) reducing availability of foreign markets for U.S. exports as a result of higher domestic input prices; or (5) provoking retaliatory tariffs or other trade actions by U.S. trading partners against U.S. exports. The absence of any guidance from Congress as to how the President should take into account these and other adverse consequences of tariffs, quotas, and other measures authorized under section 232 means that the President has unfettered discretion to punish some industries or sectors in order to benefit others. The President

is thus empowered to make precisely the kinds of broad economic and distributional choices that the Constitution assigns to Congress.

Section 232 also lacks procedural protections that might limit the unbridled discretion granted to the President. Thus, although the President may order a remedy under section 232 only if he concurs with a finding by the Secretary that imports of the subject article may threaten to impair the national security, the President is not bound in any way by any remedial recommendations of the Secretary, and he is not required to base his remedy on the report or the information provided to the Secretary through any public hearing or submission of public comments.

The President is also not required to provide an opportunity for the public to comment on the actual tariff or quota that he is considering imposing, and the Secretary's request for comments in this case did not identify any specific remedies that he or the President were considering. No one is required to prepare an environmental impact statement or a cost benefit analysis under Executive Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), as amended from time to time, or make any kind of rigorous analysis of the positive and negative effects of a proposed tariff or quota. Nor is the President required to explain his decision in light of what he or prior presidents have done with regard to previous actions under section 232 involving the same articles, including that he be consistent in his interpretation and implementation of section 232 from one proceeding to the next.

Section 232 has no provision for judicial review of orders issued by the President under it, and because the President is not an agency, judicial review is not available under the Administrative Procedure Act, 5 U.S.C. § 706. Furthermore, in a lawsuit challenging the 25% steel tariff on the ground that the President exceeded his statutory authority under section 232,

*Severstal Export GMBH v. United States*, No. 18-00057 (Ct. Int'l Trade 2018), the Department

of Justice, on behalf of the United States, took the position, with which Plaintiffs agree, that once

> the President received the report that constitutes the single precondition for his
> exercise of discretion under Section 232(c), concurred in its findings, and took the
> action to adjust imports that was appropriate "in the judgment of the President."
> 19 U.S.C. § 1862(c).  [The] decision to take action was the President's to make,
> and his exercise of discretion is not subject to challenge [in court].

Def't. Mot. to Dismiss, ECF No. 30, at 16–17, *Severstal Exp. GmBH v. United States*, (Mar. 28,

2018); *id.* at 19 ("the President's exercise of discretion pursuant to Section 232 is

nonjusticiable").[1]

### B.   THE PRESIDENT'S 25% TARIFF

On April 19, 2017, the Secretary opened an investigation into the impact of steel imports

on U.S. national security.  As part of that investigation, the Secretary held an approximately

three-hour public hearing on May 24, 2017, and provided for the submission of written

statements by interested persons.  On January 11, 2018, the Secretary sent the President his

report entitled "The Effect of Imports of Steel on the National Security."  Exhibit 5 (hereinafter,

the "Steel Report").  The Steel Report, which was not released to the public until February 16,

2018, recommended a range of alternative actions, including global tariffs, each of which had the

stated objective of maintaining 80 percent capacity utilization for the U.S. steel industry, but

with no explanation as to how a particular trade barrier would accomplish that result.  Steel

Report at 58–61.  At the same time, the Secretary issued a report with similar conclusions

regarding imports of aluminum. U.S. DEP'T OF COMMERCE, *The Effect of Imports of Aluminum*

*on the National Security* (Jan. 17, 2018), *available at*

---

[1] The *Severstal* court did not accept the government's non-reviewability argument, but instead
rejected the claim there on the merits.  *Severstal Exp. GmBH v. United States*, 2018 WL 1705298
(Ct. Intl. Trade 2018).  Plaintiffs note that there was no claim of improper delegation or
separation of powers in *Severstal.*

https://www.commerce.gov/sites/commerce.gov/files/the_effect_of_imports_of_aluminum_on_t

he_national_security_-_with_redactions_-_20180117.pdf (last visited July 19, 2018).

On February 18, 2018, the Secretary of Defense sent a memorandum to the Secretary,

with copies to various individuals who work directly for the President, stating that the Defense

Department "does not believe that the findings" in the reports on steel and aluminum "impact the

ability of DoD programs to acquire the steel and aluminum necessary to meet national defense

requirements."  Exhibit 8.  DOD did express concern about the impact of unfair trade practices

by other countries, but section 232 does not require a finding of those practices before its

remedies can be involved.

On March 8, 2018, the President issued Proclamation No. 9705, which imposed the 25%

tariff at issue in this action, applicable to all imported steel articles from all countries except

Canada and Mexico, effective March 23, 2018.  Proclamation No. 9705, 83 Fed. Reg. 11,625

(Mar. 8, 2018).  On the same date, the President imposed a similar tariff, but in the lesser amount

of 10%, on aluminum imports, also based on section 232.  Proclamation No. 9704, 83 Fed. Reg.

11,619 (Mar. 8, 2018).[2]

---

[2] To date, the President has applied section 232 only to imports of steel and aluminum, but on
May 23, 2018, the Secretary, at the request of the President, announced that he has commenced
an investigation into whether imports of automobiles, including SUVs, vans, light trucks, and
automotive parts, threaten to impair the national security.  Press Release, *U.S. Department of
Commerce Initiates Section 232 Investigation into Auto Imports*, U.S. DEP'T OF COMMERCE (May
23, 2018), *available at* https://www.commerce.gov/news/press-releases/2018/05/us-department-
commerce-initiates-section-232-investigation-auto-imports (last visited July 17, 2018).
Furthermore, in April 2017, the Secretary stated that in addition to steel and aluminum, "core
industries" for the Administration's trade agenda include "vehicles, aircraft, shipbuilding, and
semiconductors."  Jacob M. Schlesinger & Bob Davis, *Commerce Secretary Ross: Trade
'National Security' Probes Could Extend to Semiconductors, Aluminum*, DOW JONES, Apr. 25,
2017, *available at* https://www.dowjones.com/scoops/commerce-secretary-ross-trade-national-
security-probes-extend-semiconductors-aluminum/ (last visited July 17, 2018).  On July 18,
2018, Commerce initiated a section 232 investigation into uranium imports.  Press Release, *U.S.
Department of Commerce Initiates Section 232 Investigation into Uranium Imports*, U.S. DEP'T

Clause (3) of Proclamation No. 9705 authorized the Secretary "to provide relief from the [25 % tariff] set forth in clause 2 of this proclamation for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and . . . to provide such relief based upon specific national security considerations."  83 Fed. Reg. at 11,627.  On March 16, 2018, the Secretary issued an interim final rule setting forth the requirements for obtaining such relief.  Exhibit 10; 15 C.F.R. § 705, Supp. 1.

The possibility of obtaining relief pursuant to the Secretary's interim rule is quite limited because:  (a) each application for an exclusion must be submitted by a single entity; (b) each application can only be for a single product; (c) "[o]nly individuals or organizations using steel in business activities (*e.g.*, construction, manufacturing or supplying steel product to users) in the United States may submit exclusion requests," Exhibit 10 at 12,110 (which excludes importers and traders in steel such as Plaintiffs Sim-Tex and Orban); (d) there is a mandatory waiting period of 30 days during which objections may be filed; (e) there is no process to respond to or rebut objections filed, whether accurate or not; and (f) there is no fixed time within which applications must be decided, although the Secretary has stated that the review "normally will not exceed 90 days."  Exhibit 10 at 12,111.  The Secretary has acknowledged that there have been over 20,000 applications for exclusions filed, most of which have not been decided. RACHEL F. FEFER ET AL., CONG. RESEARCH SERV., R45249, SECTION 232 INVESTIGATIONS: OVERVIEW AND ISSUES FOR CONGRESS (2018) at 8–9 (citing Secretary Ross, U.S. Congress, Senate Committee on Finance, *Current and Proposed Tariff Actions Administered by the Department of Commerce*, 115th Cong., June 20, 2018).  There is no provision for judicial

---

OF COMMERCE (July 18, 2018), *available at* https://www.commerce.gov/news/press-releases/2018/07/us-department-commerce-initiates-section-232-investigation-uranium (last visited July 18, 2018).

review of the denial of an exclusion application, and given the highly discretionary and non-transparent nature of exclusion decisions, success on judicial review would almost certainly be very difficult if not impossible.

The President subsequently amended the order based on Proclamation No. 9705 in a series of proclamations to provide for certain country-based exclusions, some for limited durations and others indefinite.  *See* Proclamation No. 9711, Exhibit 11 (Mar. 22, 2018); Proclamation No. 9740, Exhibit 12 (Apr. 30, 2018); and Proclamation No. 9759, Exhibit 13 (May 31, 2018).  As a result, imports of steel from Argentina, Brazil, and South Korea are presently exempt from the 25% tariff without an end date, but are subject to section 232 absolute quotas.[3]  Australian imports are not subject to either the 25% tariff or any quotas; the imports from all other countries, including Canada, Mexico, and the members of the European Union, are subject to the 25% tariff.  Since May 31, 2018, the President has made no further changes in the application of the 25% tariff, but as Secretary Wilbur Ross stated on that date, "The president has the authority unilaterally. . . to do anything he wishes at any point subsequent to today."  Heather Long, *Trump has officially put more tariffs on U.S. allies than on China*, WASH. POST, June 1, 2018, at A13, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/05/31/trump-has-officially-put-more-tariffs-on-u-s-allies-than-on-china/?utm_term=.98551855c7ba (last visited July 17, 2018).

There can be no doubt as to the massive impact that the 25% tariff has had on imported steel, and, as shown below, on the members of Plaintiff AIIS, including Plaintiffs Sim-Tex and Orban.  Through the middle of June, which is before the 25% tariff applied to imports from

---

[3] Https://www.cbp.gov/trade/programs-administration/entry-summary/232-tariffs-aluminum-and-steel (last visited July 18, 2018).  A printout of the website as of July 18, 2018 is included in Exhibit 14 of the Statement of Undisputed Facts.

Canada, Mexico, and the countries of the EU, $582 million had been collected from that tariff

alone.  Mark Niquette, *Trump's Metal Tariffs Have Yielded More than $775 Million*,

Bloomberg, June 21, 2018, *available at* https://www.msn.com/en-us/finance/markets/trumps-

metal-tariffs-have-yielded-more-than-24775-million/ar-AAyWUCV (last visited July 17, 2018).

The 25% tariff imposed under section 232, and the exemptions for certain countries, is

not based on any showing of illegal or unfair trade practices by steel producers in other

countries.  Those practices are already the basis of additional duties imposed pursuant to the

antidumping and countervailing duty laws of the United States.  According to the Steel Report,

as of January 11, 2018, for the steel industry alone, there were 164 such orders in effect, and

there were an additional 20 publicly announced investigations underway.  Steel Report at 36,

Appendix K, pp.1-3.  The 25% tariff at issue here is on top of any such antidumping or

countervailing duties.

### C.   THIS ACTION

The complaint was filed on June 27, 2018, along with a motion under 28 U.S.C. § 255 to

designate a three-judge panel of this Court to hear and determine the constitutional issues

presented by Plaintiffs.  The Court has jurisdiction under 28 U.S.C. § 1581(i)(2) & (4).  The

defendants are the United States and Kevin K. McAleenan, the Commissioner of U.S. Customs

and Border Protection, who is responsible for collecting the payments made on account of the

25% tariff imposed by the President.  On July 18, 2018, the defendants filed their Response to

Plaintiffs' Motion for a Three Judge Panel (Docket No. 19 at 10), in which they concluded that

> a three-judge panel need not be convened to entertain plaintiffs' complaint.  Consistent
> with our general past practice, however, we defer to the Chief Judge's discretion in
> determining whether to convene a three-judge panel for this case.

As described in Richard Chriss' declaration (Exhibit 1), Plaintiff AIIS is a non-profit

membership corporation that brings this action on behalf of its 120 members.  AIIS's members,

which include the Plaintiffs Sim-Tex and Orban, have various business connections with the imported steel products that are subject to the 25% tariff challenged in this action. Those members include companies that use imported steel in the manufacture of their own products, traders in steel, importers, exporters, freight forwarders, stevedores, shippers, railroads, port authorities, unions, and many other logistics companies, all of which have been and will continue to be adversely affected by the 25% tariff on imported steel products. Together, AIIS's members handle, import, ship, transport, or store approximately 80% of all imported basic steel products in the United States.

As described more fully in Charles Scianna's declaration (Exhibit 2), Plaintiff Sim-Tex is a Texas importer of steel products. It is also the leading wholesaler in the United States of oil country tubular goods (OCTG) casing and tubing, which are carbon and alloy steel pipe and tube products used in the production and distribution of oil and gas. Sim-Tex imports directly, as the importer of record, and indirectly, through traders, approximately 40,000–45,000 tons per month from Korea, Taiwan, Brazil, Germany, Italy and other sources.

Sim-Tex also purchases and sells OCTG tubing (sizes 2" through 3 ½") produced in the United States. Domestic OCTG producers generally do not produce these smaller sizes in sufficient quantities to fulfill Sim-Tex's needs of approximately 20,000–25,000 tons of tubing per month because they can make larger diameter pipe on the same equipment at much higher profit margins. Sim-Tex's allocation of smaller size OCTG tubing from domestic producers is less than 3,000 tons per month, and the balance must be made up with imports. As the importer of record on most of these purchases, it is directly responsible for paying all import duties, including the 25% tariff.

Plaintiff Orban is a specialized steel trader operating in California that purchases globally from leading carbon, alloy, and stainless and high nickel alloy manufacturers and sells to manufacturers in the United States.  Exhibit 3.  It is a member of Plaintiff AIIS, and it purchases between 200,000 and 250,000 tons of imported steel per year, most of which is subject to the 25% tariff.

For Plaintiffs Sim-Tex and Orban and other members of Plaintiff AIIS that purchase imported steel or products that contain imported steel, the 25% tariff has already, and will continue to, increase the cost of imported steel and, unless those members increase their sales prices, the added tariff costs will reduce their profits.  Alternatively, those members can attempt to maintain their profit margins by raising the prices they charge, which will likely reduce their sales in the United States and abroad, and may require them to lay off workers or reduce their wages.  The 25% tariff will also have a negative effect on their cash flow and on their credit lines.

If the 25% tariff is held unconstitutional, those companies, including Plaintiffs Sim-Tex and Orban and those members of Plaintiff AIIS that actually pay the 25% tariff, may be able to obtain refunds of those tariff payments from the United States.  But those companies will not be able to recover their lost profits from reduced sales or lower profit margins, and those lost profits constitute irreparable harm to those companies.  Moreover, for those workers at those companies who will have their incomes reduced because there is less work for their companies as a result of the impact of the 25% tariff, those lost wages cannot be recovered and therefore constitute further irreparable harm.

Many AIIS members do not themselves purchase imported steel or products containing imported steel, but their businesses are involved in various phases of the transportation of

imported steel.  The 25% tariff was intended to, has had, and will continue to have the effect of, reducing the total volume of imported steel.  As a result, the revenue will be reduced (and possibly jobs lost) for (a) those members that transport imported steel that are paid by the volume of imported steel that they transport; (b) the workers whose unions are members of AIIS and who are paid, in part, by the volume of imported steel that they handle in moving that steel from one location to another; and (c) the port authorities, customs brokers, insurance companies, and logistics companies that are members of AIIS and that derive significant portions of their revenue from their handling of imported steel.  Because none of these members of AIIS will have paid the 25% tariff, directly or indirectly, they will have sustained irreparable damage because they will have no claim for monetary damages from the United States even if the 25% tariff is held to be unconstitutional.

## ARGUMENT

### SECTION 232 IS UNCONSTITUTIONAL AS AN IMPROPER DELEGATION OF LEGISLATIVE AUTHORITY AND A VIOLATION OF SEPARATION OF POWERS.

Plaintiffs' nondelegation challenge to section 232 and the 25% tariff issued pursuant to it has two inter-related elements:  the delegation to the President in section 232 lacks the "intelligible principle" required by the Supreme Court since it decided *J.W. Hampton, Jr,. & Co. v. United States*, 276 U.S. 394, 409 (1928), and the President's choice of remedies under section 232 is not subject to judicial review or to any of the other procedural checks that are the hallmarks of controlling Executive Branch decisionmaking in the administrative state.  The result is that President has unbridled discretion to impose whatever trade barriers he chooses with nothing in section 232 to limit him in any way.  That result—"a blank check for the President," *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004)—is wholly antithetical to the separation of powers and checks and balances embodied in our Constitution and therefore cannot stand.

The Framers understood that "[t]he accumulation of all powers, legislative, executive, and judiciary in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).  To guard against that possibility, the Constitution contains a separate Article for each of the three branches, which spells out their respective duties.  Article I, section 1 of the Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. CONST., art. I, § 1.  As for the President, the Constitution specifies the powers of the office and then in Article II, section 3, directs that "he shall take Care that the Laws be faithfully executed."  U.S. CONST., art. II, § 3.  As Justice Black observed for the majority in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952):  "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  Justice Black then applied that principle to the case before him in language fully applicable to this challenge:  "The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."  *Id.* at 588.

To be sure, Congress is not precluded from assigning to the President or others in the Executive Branch the authority to carry out directives of Congress embodied in duly enacted laws.  Congress may constitutionally permit officials in the Executive Branch to make some policy decisions.  But in section 232, Congress granted the President virtually unlimited discretion over the core Article I power to impose taxes, and to do so in unlimited amounts and duration, as well as to mandate quotas, licensing requirements, and similar measures on entire classes of imported goods affecting wide swaths of the U.S. economy.  There is a point beyond

which the Executive Branch's delegated authority may not constitutionally go.  The Constitution requires that Congress "lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform . . . ." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (alteration in original) (quoting *J.W. Hampton*, 276 U.S. at 409).  As Plaintiffs now show, section 232 does not have intelligible principles for either its trigger finding or its remedies, nor does it contain any other protections against presidential misuse of its powers that will assure that the President complies with the law and that principles of separation of powers are preserved.

> **1.  Section 232 Lacks Intelligible Principles and Other Protections Necessary to Assure that the President Executes the Law and Does Not Make the Law.**

Under section 232, the President is free to act as long as he concurs in the finding of his own Secretary of Commerce that a subject article (here steel) "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security . . . ."  19 U.S.C. § 1862(c)(1)(A).  National security is broad term on its own, but Congress has vastly expanded it beyond its ordinary meaning in section 232(d):

> the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, **without excluding other factors**, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d) (emphasis added).  The result is that national security in section 232 includes the impact of potentially any imported product—with no guidance or restrictions on the definition of the product—on the economic welfare of any domestic industry, the impact of foreign competition on our internal economy, and the impact of foreign

competition on federal government revenues.  Indeed, "national security" as defined in section 232(d) has no conceptual limits as underscored by the emphasized "without" phrase.  The President is expressly authorized to consider any "other factors" he wishes, without any guidance or limit on what those factors should be.

Both section 232(b), governing the Secretary's finding, which serves as a trigger for the President's authority under section 232(c), and section 232(c), governing the President's authority to adjust imports, refer to "national security."  The elastic—indeed, virtually unbounded—definition of national security set forth in section 232, lacks the necessary intelligible principle to serve as a constitutional trigger to activate Presidential powers to impose trade barriers under section 232(c).  But even if "national security" as defined in section 232 could be considered sufficient to provide a required intelligible principle, section 232(c) is still a constitutionally improper delegation because it allows the President to "determine the nature and duration of the action [*i.e.* trade barriers] that, in the judgment of the President, must be taken to adjust the imports of [steel] and its derivatives so that such imports will not threaten to impair the national security," 19 U.S.C. § 1862(c)(1)(A)(ii), as that term has been expansively defined.  It is this limitless grant of discretionary remedial powers, as applied to section 232's capacious definition of national security, which eliminates any doubt as to the constitutionally improper delegation of lawmaking authority to the President, as the imposition of the 25% tariff illustrates.

First, section 232 contains no guidance or limit on the kind of action the President may take.  For instance, he may impose tariffs on goods that are currently duty-free or increase tariffs above those that currently exist under the law—with no restrictions on the amounts he may impose.  Or he may elect to order quotas—whether or not there are existing quotas—again with no limit on how much a reduction from an existing quota (or present level of imports) there can

be.  In addition, the President could choose to impose licensing fees for the subject article, either

in lieu of or in addition to any tariff or quota already in place.  Or the President could take an

unlimited array of other actions, such as imposing inspection regimes or regulations governing

product characteristics or methods of production.  The President's imagination is the only limit

on the kind of action he can take to adjust imports.  And for all these changes to the existing

tariff schedule or import quotas, the President may select the duration of each such change

without any controls on his choice, and he may make changes at any time, with no advance

notice or delay in the effective date.

Second, the articles subject to import adjustment under section 232 will usually vary in

uses, quality, specifications, availability in the United States, and relation to national security, yet

section 232 offers no guidance on how the President should handle such variations or how to

define the "product."  The steel imports giving rise to this case illustrate the problem.  "Steel"

encompasses a broad class of products ranging from flat-rolled steel to pipes and tubes, and from

carbon steel alloy to stainless steel.  The Secretary himself identified five main categories of

imported steel products, comprised of 177 sub-categories.  *See* Steel Report at 21-22.  The

submissions to the Secretary identified substantial additional differences among steel products

that would bear directly on the likely impact of their importation on the national security and the

economy generally as shown in the following paragraph.  Citations to the written statements

presented at the May 24, 2017 hearing are reproduced in Appendix F to the Steel Report (as well

as in Exhibit 6) and are in italics, with the page in Appendix F in brackets after the name of the

presenter.  Citations to the additional Public Comments have the name of the submitting entity

followed by the number of that submission in parenthesis.  The names and numbers appear as

Appendix G to the Steel Report.  The Comments are available at

https://www.bis.doc.gov/232steel, in the Public Comment Library located there and are included in Exhibit 7 of the Statement of Undisputed Facts.[4]

The Secretary received submissions that pointed out significant differences among steel products generally.  These included that (a) U.S. companies can supply all the defense needs for the product;[5] (b) where there is no defense use for the product;[6] (c) U.S. companies do not make the product, do not make it in sufficient quantities to fill the non-defense needs for the product, and/or do not make it with the quality required by the purchaser of the product and/or its customers;[7] (d) the product is not available from U.S. companies in the portion of the United States where the purchaser is located and the transportation cost of sending it there is prohibitive;[8] and (e) because of the highly specialized nature of the product, and the relatively limited uses, it is not economical for domestic steel companies to produce it, or the ability to increase supplies of the product can only occur over a number of years and then only if demand for the product can be assured.[9]  The problem under section 232 is that Congress did not tell the President even whether to take account of these common sense differences, nor was he was required to explain whether he considered them at all or why he did not take them into account, as federal administrative agencies would be required to do.

---

[4] The comments submitted by the National Foreign Trade Council (120) pointed up the many difficulties in treating the steel industry as a monolith.

[5] *Hyundai* [87]; *AIIS* [89-90]; *Ohio Coatings* [108].

[6] *EUROFER* [77]; *Can Manufacturers* [94]; *Tire Manufacturers* [96]; *Air Distribution* [100]; Acenta (1); Bway (31); Hirsh (80); Hitachi (81); Lyman (103); Silgan (149); Steelcase (166).

[7] *Tire Manufacturers* [96]; *Nippon* [83-84]; Allied (6); Autoliv (20); BorgWarner (25); CSN (49); Dayton (53); DB&S (54); Drill Rod (59); DS Containers (61); Electrolux (65); Freudenberg (71); Grant Prideco (75); Jarvis (92); JTEKT (94); Kerr (95); Metal Flow (110); Pasha (130); Power Partners (136); Precision Metal (140); Simonds (150); Spectrum (151).

[8] *Steelscape* [103]; Independent Pipe (85).

[9] H&T (78); Kiewit (97); M7 (104); TMK (174).

The President chose to disregard all of these differences in his mandate for a 25% tariff on steel imports.  He was not required to treat all imported steel products identically, nor was he forbidden from doing so.  More importantly, Congress did not include any guidance as to how to choose which differences to disregard or which ones he must/may treat separately.  Despite the obvious fact that most categories of imported products that might threaten to impair our national security will have important differences within a given category, Congress said not one word in section 232 as to whether the President must, may, or must not treat them the same when imposing tariffs or quotas under section 232.  On this aspect, there is no congressional principle at all, intelligible or otherwise, to guide the President.  He was simply left to write new law himself as to which, if any, of these differences he should recognize and if so, in what manner. Nor does the fact that the President directed the Secretary to create an administrative exclusion process solve the delegation problem.  As the Supreme Court made clear in *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 473 (2001),

> The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would **itself** be an exercise of the forbidden legislative authority. Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.

(emphasis in original).  Moreover, the massive exclusion system—with its approximately 20,000 pending applications—not only highlights the limitless range of actions available to the President under section 232, but is also a recognition of the need to treat different products differently, but with no guidance from Congress on how to do so.

Third, section 232 does not provide the President with any guidance on whether and under what circumstances he should treat all imports of a given product the same, regardless of country of origin, or whether and under what circumstances he may or must treat some of them

differently.  If national security in section 232 were limited to "national defense," as traditionally understood, that might provide some limits.  In that case, the concept of national defense might suggest that the President should take into account the geographic proximity of countries supplying the imports, or the fact that a country is a close ally, and therefore the likelihood that supplies would continue when needed most.  But because of section 232(d)'s inclusion of almost any product that has an impact of any kind on our economy, there is no limiting principle, and hence the President could exclude countries for any reason, for no reason, or for a reason that may have nothing to do "national security,"—such as the President's personal dislike of the leader of the exporting country, or to use as a bargaining chip over a wholly unrelated matter.  Indeed, the President could impose tariffs of 15%, 25%, and 35%, and could assign a particular rate to whatever countries or industries he preferred or wished to punish, and there is nothing in section 232 to prevent him from doing so.

Fourth, tariffs, quotas, or any other actions the President may take to adjust imports have adverse consequences on many segments of our economy, far beyond the increased price that buyers will have to pay for the product.  Section 232 provides no guidance as to how or whether the President should take these collateral consequences into account when deciding on an action under section 232(c).  The most significant of these harms to others are set forth *supra* at 7, as amplified by paragraph 27 of the Complaint, and while some may be unique to imported steel, most of these consequences are based on fundamental principles of supply and demand that Congress encounters whenever it drafts economic legislation.  Nonetheless, section 232 does not contain so much as a hint as to how the President is to resolve the inevitable tradeoffs between the benefits of import protection to the protected domestic industry versus the harms to the many parts of the economy adversely affected by import protection when deciding what "action . . .

must be taken to adjust the imports of [steel] and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A)(ii).  In short, the choices under section 232 are entirely up to the President, which is the constitutional downfall of section 232.

Another way to illustrate how far section 232 is from providing assurances that Congress, not the President, makes the law regarding the imposition of trade barriers is to compare how free the President was from the procedural safeguards that would apply if he were subject to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), which both sides agree that he is not.  The APA was enacted in 1946 to place some controls on the administrative agencies that had been created by the New Deal and its predecessors.  To understand how few of the APA protections are provided by section 232, consider what would have had to happen if the tariff order here were issued as a rule, subject to 5 U.S.C. § 553, like the rule at issue in *Whitman*, *supra.*  In contrast to the investigation begun by the Secretary here, there would have been a specific proposal of a rule to which comments could have been directed.  In this case, the public submitted their views on the general issue of tariffs or quotas of steel imports, but there was never an opportunity to comment on the specifics of any of the President's Proclamations before they were issued in final form.[10]

Second, as rulemaking has evolved, agencies are now required to make their decisions on the basis of the materials that they cite in the notice of proposed rulemaking and the submissions made by those who comment.  There is no such limit on the President when he invokes section 232.  Section 553 of the APA also imposes a duty on the agency to respond to the principal

---

[10] Nor was there an opportunity to comment on the Secretary's slightly more specific recommendation, which was not made public until February 16, 2018, shortly before the President's 25% tariff was announced on March 8, 2018.

objections made in the course of the rulemaking, a requirement designed to assure that the agency has carefully considered all objections to its proposal and explained why it did not accept them.  Again, section 232 has no comparable requirements.  This duty of explanation would require the agency to show that its rule was consistent with similar rules and other actions that it had previously taken, a requirement that section 232 does not impose on the President.  Finally, even though the 25% tariff is surely having a major economic impact on our economy, no one was required to prepare an environmental impact statement or a cost benefit analysis under Executive Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), or make any kind of rigorous analysis of the positive and negative effects of a proposed tariff or quota.

One example from the tariff imposed by the President will illustrate the impact that these procedural protections could have had on the President's action.  The percentage selected was 25%, but there is not a word of explanation as to why that number was chosen, especially when on the same day, the President imposed a tariff on aluminum imports of 10%.  The Secretary's recommendation suggested a goal for domestic steel production to achieve 80% capacity, and if the 25% figure were chosen to meet that goal, and if the APA applied, there would have to be an analysis showing why that tariff would produce that result.  But if that had been done, the analysis would also have had to factor in the various country exclusions that have been added since the 25% tariff was announced, as well as an estimate of the impact from the grants of discretionary exclusions on a product and user-specific basis.  As it was, the President simply announced his 25% tariff, with no obligation to justify it.

Similarly, many commenters objected to applying the tariff to them because their products do not need tariff protection for a variety of reasons:  these include the product having no national defense uses; domestic producers already supplying all the national defense needs;

and the product being not available in needed specifications from domestic steelmakers for a variety of reasons. *Supra* at 21. Even with the extremely broad national security definition in section 232, if the APA applied, the agency would have had to explain why there were no exceptions in the rule itself to cover those circumstances, especially since the problems were recognized, but the affected entities (actually only some of them) were remitted to a highly discretionary and limited relief process administered by the Secretary. Moreover, that explanation would have had to include reasons why (a) the opinion of the Defense Department that action under section 232 was not "necessary to meet national defense requirements," (b) the manifold adverse consequences were not serious enough to offset the benefits of the 25% tariff, and (c) the seeming material differences among countries in their abilities and willingness to provide steel, when the interest of national security required, were disregarded also.

Last, and in addition to these multiple failures of Congress to cabin the unbounded discretion of the President under section 232(c), there is no provision in section 232 for the judicial review of the President's decisions under it. Moreover, since the 1990s, the APA has not been available as an avenue for judicial review of the President's actions. In both *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and *Dalton v. Specter*, 511 U.S. 462 (1994), plaintiffs sought APA review of decisions made by the President under other statutes. The Court, however, refused to consider the merits of those claims, although it did consider a constitutional claim in *Franklin*. *Franklin*, 505 U.S. at 796, 806; *Dalton*, 511 U.S. at 476. It held that, under the relevant statutes, only the final decision of the President can be challenged. *See Franklin*, 505 U.S. at 779. Moreover, because the President is not an agency under the APA, his actions are also not subject to judicial review under the APA for claims that his discretionary decisions

failed to comply with the APA and the applicable substantive statutes (like, in the present case, section 232). *Franklin*, 505 U.S. at 801; *Dalton*, 511 U.S. at 476.

Because there was no other basis to review the President's decision, those decisions of the President, like his decision imposing the 25% tariff on steel imports, are nonreviewable.  Not surprisingly, that is also the position that the Department of Justice took regarding section 232 in *Severstal*, *supra* at 9, with regard to the President's discretionary determinations, which includes his decision to impose the 25% tariff.[11]  Moreover, the failure to provide any judicial review of the President's compliance with section 232 removes even the theoretical possibility that a court could find an intelligible principle guiding or limiting the President's choices, which underscores the total transfer of legislative power from Congress to the Executive, "so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed . . . ." *Yakus v. United States*, 321 U.S. 414, 426 (1944).  And, of course, if the 25% tariff had become law via a statute, the ultimate checks of agreement by two Houses of Congress and the signature of the President (or a veto override) would have been assured.

In short, the final protection against presidential arbitrary action—the ability of injured parties such as Plaintiffs to seek redress from Article III judges—is foreclosed, and the President is free to do what he did here:  to decide unilaterally whether to impose trade barriers, which ones to utilize, at what levels, for what duration, applicable to what products, which countries should receive exemptions, and whether to ignore the inevitable adverse consequences from imposing the selected barrier.  Section 232 allows such limitless discretion, and in doing so

---

[11] Commerce did not claim, and Plaintiffs agree, that if the President imposed this tariff without the statutorily-required finding by the Secretary, no court could review that failure.  In that unlikely event—the Secretary does serve at the pleasure of the President—a court might well have mandamus jurisdiction under 28 U.S.C. § 1361, to bar the President from imposing the tariff until he received the Secretary's finding.

violates the nondelegation doctrine and creates an administrative scheme that is inconsistent with

the separation of powers and the checks and balances embedded in our Constitution.  As Justice

Scalia observed in his dissenting opinion, in which Chief Justice Roberts and Justice Alito

joined, in *Zivotofksy v. Kerry*, 135 S. Ct. 2076, 2116 (2015):

> Before this country declared independence, the law of England entrusted the King
> with the exclusive care of his kingdom's foreign affairs. . . The People of the
> United States had other ideas when they organized our Government. They
> considered a sound structure of balanced powers essential to the preservation of
> just government, and international relations formed no exception to that principle.

### 2.   Relevant Court Decisions Support Plaintiffs

In 1935, the Supreme Court struck down two statutes of Congress on the ground that each

of them involved an excessive delegation of legislative authority in violation of Article I, section

1 of the Constitution.  *Panama Refining Company v. Ryan*, 293 U.S. 388 (1935); *A.L.A.*

*Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).  Since then, the Court has

rejected every delegation claim to come before it, while reiterating that Congress must include

the necessary intelligible principles when it assigns implementation responsibilities to the

President or federal agencies.

Although it may appear that the nondelegation doctrine is alive in name only, the Court's

recent grant of certiorari in *Gundy v. United States*, 138 S. Ct. 1260 (2018), suggests the

contrary.  At issue in *Gundy*, which will be argued in the Court on October 2, 2018, is whether

the statute authorizing the Attorney General to decide whether to apply the provisions of the

federal Sex Offender Registration and Notification Act, 34 U.S.C. § 20901 *et seq.*, to offenses

that occurred before that Act was passed violates the nondelegation doctrine.  As the merits

briefs filed by petitioner and a dozen amici in *Gundy* show, the nondelegation doctrine is very much alive.[12]

As Plaintiffs acknowledged in Plaintiffs' Memorandum in Support of Motion for a Three-Judge Panel (at 4), the Supreme Court has previously considered the applicability of the nondelegation doctrine to section 232 in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976).  The Court there rejected a statutory claim that section 232 did not permit the imposition of import licensing fees, but rather permitted only quantitative restrictions.  Before considering that statutory argument, the Court made the following observation:

> Preliminarily, we reject respondents' suggestion that we must construe § 232(b) narrowly in order to avoid a "serious question of unconstitutional delegation of legislative power." Respondents Brief for 42. Even if § 232(b) is read to authorize the imposition of a license fee system, the standards that it provides the President in its implementation are clearly sufficient to meet any delegation doctrine attack.

*Algonquin*, 426 U.S. at 558-59.  This statement is *dictum* because, as discussed further below, the Court ultimately held that the language of section 232 permitted such licensing fees.  Thus, *Algonquin* does not control the outcome of the facial constitutional challenge to section 232 presented in this action.

There are two principal distinctions between *Algonquin* and this case.  First, all parties in *Algonquin* agreed that there was full judicial review of the President's decision there, which is no longer true.  When the Supreme Court heard *Algonquin*, no party and no Justice suggested that full judicial review of the order being challenged was not available.  Accordingly, the Court decided the merits of both the statutory and constitutional challenges presented.  As noted above, in the interim between 1976 and now, the legal landscape of judicial review of presidential

---

[12] The grant is even more significant in *Gundy* because, as the opposition of the United States pointed out, all eleven federal circuits that had ruled on the nondelegation claim had rejected it and the Court had previously denied review on that question on fifteen separate occasions.  Br. in Opp'n, at 21-22, *Gundy v. United States*, No. 17-6086 (S. Ct. Dec. 18, 2017).

decisions involving implementation of federal statutes has changed markedly as a result of *Franklin* and *Dalton*, *supra*.  There is no longer any judicial review of whether the President has abused his discretion, or whether any of the protections afforded by the APA and other comparable statutes have been provided, which are essential to help preserve the limits on the executive branch that the nondelegation doctrine protects.

In a line of cases, the Supreme Court has emphasized that the absence of judicial review and other procedural protections heightens nondelegation concerns.  *See Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 218-19 (1989) (reaffirming "our longstanding principle that so long as Congress provides an administrative agency with standards guiding its actions such that a court could ' "ascertain whether the will of Congress has been obeyed," ' no delegation of legislative authority trenching on the principle of separation of powers has occurred").  *See also Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO v. Connally*, 337 F. Supp. 737, 759-60 (D.D.C. 1971) (Leventhal for three-judge panel) (emphasizing importance of judicial review in context of nondelegation claims as providing "some measure against which to judge the official action that has been challenged") (quoting *Arizona v. California*, 373 U.S. 546, 626 (1963)).

Most directly relevant is *Touby v. United States*, 500 U.S. 160, 163 (1991), a nondelegation challenge to the Attorney General's authority to temporarily schedule drugs under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, when doing so was "necessary to avoid an imminent hazard to the public safety."  The defendant in *Touby* did not argue that the temporary scheduling procedures lacked an intelligible principle per se.  Instead, the defendant argued, *inter alia*, that the temporary scheduling procedures violated the nondelegation doctrine because the Attorney General's temporary scheduling order was not subject to judicial review.

*See Touby*, 500 U.S. at 168.  The Court rejected the defendant's claim, but only because the

Controlled Substances Act provides for judicial review of a permanent scheduling order.  *Id.*

Hence, the Court concluded that the effect of the temporary scheduling procedures was "merely

to postpone legal challenges to a scheduling order for up to 18 months," and even then, judicial

review might be available in some circumstances.  *Touby*, 500 U.S. at 168-69.

Here, the failure to provide any judicial review of the President's compliance with section

232 removes even the theoretical possibility that a court could find an intelligible principle

guiding or limiting the President's choices.  Combined with the absence of any limitations on

what the President may consider in making his choices, the lack of judicial review underscores

the total transfer of legislative power from Congress to the Executive, without any means "to

enable Congress, the courts and the public to ascertain whether the" President has complied with

the will of Congress.  *Yakus*, 321 U.S. at 426.  Or, as then Justice Rehnquist said in his

concurring opinion in *Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686

(1980), the intelligible principle requirement "ensures that courts . . . reviewing the exercise of

delegated legislative discretion will be able to test that exercise against ascertainable standards."

Second, the plaintiffs in *Algonquin* did not bring a facial challenge to the constitutionality

of section 232, like the one that Plaintiffs here are bringing.  Rather, in *Algonquin*, the only issue

before the Court was whether section 232 authorized the remedy selected by the President.  In

other words, the *Algonquin* plaintiffs alleged that the President had exceeded his authority under

section 232, while Plaintiffs here allege that Congress has violated the Constitution by failing to

impose any limits on the President's authority under section 232.

Specifically, the *Algonquin* plaintiffs argued that section 232 did not authorize the use of

licensing fees as a means of adjusting imports, and that only quotas or other quantitative means

of control were permitted.  To bolster that statutory argument, the plaintiffs contended that reading section 232 to permit the imposition of licensing fees would violate the nondelegation doctrine.  *Algonquin*, 426 U.S. at 560-61.  In order to avoid the delegation problem, the plaintiffs urged the Court to construe section 232 to allow only quotas or quantitative means of adjusting imports, rather than duties or licensing fees.  *Id.* at 561.  The Court declined to do so, and in the course of so ruling it concluded that the government's reading of section 232 created no delegation problems.  *Id.* at 558-59, 561.

On the merits of the delegation claim there, plaintiffs' argument in *Algonquin* was essentially an avoidance claim and, as such, was extremely weak and hardly measures up to the claim of Plaintiffs here.  Plaintiffs agree with the *Algonquin* Court that Congress did not limit the President's choice of remedies to quotas and quantitative means of control.  But that is only part of the constitutional problem:  Congress placed no limits or restrictions at all on this choice of remedies, on top of creating an almost unlimited definition of national security.  Surely, if Congress had listed all three remedies in section 232, and directed the President to choose the most appropriate one under the circumstances, there would have been no delegation issue in *Algonquin*.  And since the plaintiffs in *Algonquin* never suggested that the remedy chosen was unknown in the law, such that Congress could not have anticipated it being used, the actual statute—even without the choice of remedies specified—was no more vulnerable to an excessive delegation claim than if Congress had given the President an express choice among specified remedies.

By contrast, Plaintiffs here make no statutory argument, nor could they because, as shown above, there are no provisions in section 232 to tell the President whether to address at all, and if so, how to take into account, the numerous major policy questions that arise when an

action to adjust imports like the 25% tariff is being considered.  Thus, unlike *Algonquin*, in which the plaintiffs relied on the nondelegation doctrine to achieve their preferred statutory construction, Plaintiffs here frontally challenge the breadth of the delegation in section 232 as unconstitutional.  Whereas the plaintiffs in *Algonquin* alleged that the *President* had exceeded the limits imposed by Congress by using licensing fees rather than quotas, Plaintiffs here allege that *Congress* violated the nondelegation doctrine by providing *no* meaningful limits on when or how the President may decide that foreign competition is a threat to the domestic economy and how the President should or must exercise his authority to "adjust imports."  Because Algonquin merely asked the Supreme Court to choose between two possible readings of the statute—one that permitted licensing fees and one that did not—the Supreme Court never had to consider the completely unfettered discretion, described in the previous subsection, that Congress conferred on the President in making a whole range of choices beyond simply the type of trade barrier.  For these reasons, as well the lack of judicial review that was available in *Algonquin*, that decision does not stand as a barrier to the improper delegation claim that Plaintiffs present here.

Turning now to the applicable law in nondelegation challenges, the outcomes depend on the degree of specificity in three aspects of the statute at issue:  the triggering event or finding; the range of remedies available; and the procedural protections available to help assure that the will of Congress is followed.  For that reason, general statements in court opinions about the constitutionality of specific statutory schemes offer limited assistance in deciding cases involving different statutes.  In Plaintiffs' view, there are no recent decisions of the Supreme Court or other appellate courts that deal with nondelegation claims involving statutes remotely comparable to section 232.  For that reason, Plaintiffs do not argue that any prior Supreme Court rulings control, or directly support, their nondelegation claim.  But nor are there judicial rulings

rejecting nondelegation challenges to statutes as open-ended as section 232. Nonetheless, there

are two fairly recent Supreme Court decisions—*Mistretta v. United States*, 488 U.S. 361 (1989),

and *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001)—that contain

extensive discussions of the nondelegation doctrine that are consistent with the position taken by

Plaintiffs here, even though the statutes were upheld in both cases.

At issue in *Mistretta* were provisions of the Sentencing Reform Act of 1984, 18 U.S.C.

§ 3551 *et seq.* ("SRA"), under which sentencing guidelines were to be issued by a seven-person

commission. 28 U.S.C. § 991. Congress decided to replace the prior system under which federal

judges were authorized to impose any sentence that they deemed appropriate within the statutory

limits, which led to extreme variations in the length of sentences for similar crimes, based largely

on the differences in sentencing approaches of different federal judges. *Mistretta*, 488 U.S. at

364-65. In addition, the length of an imposed sentence also varied widely because of the

possibility of parole, which was not applied in a consistent manner. *Id.* Thus, the use of the

guidelines was to reduce, but not eliminate, the discretion of the sentencing judge when applied

to a clearly-defined triggering event—the conviction of a federal offense—the parallel to section

232's finding that imports of a product such as steel may threaten to impair the national security

(as capaciously defined).

The challenge in *Mistretta* was that Congress had not made what Justice Scalia in his

dissent characterized as "the decisions [that] are far from technical, but are heavily laden (or

ought to be) with value judgments and policy assessments." *Mistretta*, 488 U.S. at 414 (Scalia,

J., dissenting). The majority did not disagree that "Congress has delegated significant discretion

to the Commission to draw judgments from its analysis of existing sentencing practice and

alternative sentencing models," *id.* at 379, but nonetheless upheld the delegation because of the

34

extensive directions included in the statute.  *Id.* at 374.  Set forth in the paragraphs below are the most significant of these controls on what the Commission must do, must not do, and might do as taken from the discussion in the majority opinion of Justice Blackmun.  *Id.* at 374-77.  What is most significant is not their number, but their comprehensive coverage of the key issues likely to arise in constructing the guidelines, in marked contrast to section 232(c)'s open-ended invitation to the President to "determine the nature and duration of the action that, in [his] judgment . . . must be taken to adjust the imports of the [steel] and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c).

Among the most important of these directions for the guidelines were the following:

1)      It specified three goals to guide the Commission: to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records ... while maintaining sufficient flexibility to permit individualized sentences," and to "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."  *Mistretta*, 488 U.S. at 374 (alteration in original);

2)      The law specified four sentencing purposes that had to be followed: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed . . . correctional treatment."  *Id.* (alteration in original);

3)      The guidelines had to have a matrix using both the nature of the offense and the criminal history of the defendant.  *Id.* at 375-376;

4)      With regard to the offense element, "Congress directed it to consider seven factors: the grade of the offense; the aggravating and mitigating circumstances of the crime; the nature and degree of the harm caused by the crime; the community view of the gravity of the offense; the public concern generated by the crime; the deterrent effect that a particular sentence may have on others; and the current incidence of the offense." *Id.* at 375;

5)      The guidelines could not alter laws on existing maximums or minimums. *Id.*;

6)      The Commission was required to use the average of current sentences as a "starting point." *Id.*;

7)      There were to be ranges within the guidelines that could not exceed certain parameters. *Id.*;

8)      Consideration of race, gender, national origin, creed, and socioeconomic status were forbidden.  *Id.* at 376;

9)      Parole was ended and there had to be strict limits on the amount of time a sentence could be reduced for good behavior in prison.  *Id.* at 367;

10)      It allowed judges to deviate above or below the guidelines, with an accompanying statement of reasons, from which both the defendant and the United States could appeal, as well as providing for appeals based on an incorrect application of the guidelines or their illegality.  *Id.* at 367-68;

11)      The Commission had to consider eleven factors regarding the defendant: "the offender's age, education, vocational skills, mental and emotional condition, physical condition (including drug dependence), previous employment record, family ties and responsibilities, community ties, role in the offense, criminal history, and degree of dependence upon crime for a livelihood." *Id.* at 376;

12)     "In addition to these overarching constraints, Congress provided even more detailed guidance to the Commission about categories of offenses and offender characteristics." *Id.* at 376-77.

In terms of sheer numbers of instructions from Congress, the difference between the SRA and section 232 could not be greater.  Of course, although the situations for which the two laws were written are not comparable, the proper role for Congress in both is the same:  to provide directions regarding the principal choices that the Commission or the President would have to make, and to provide guideposts to cabin the discretion of the Commission or the President in making them.  In that regard, the SRA anticipated the areas where fundamental decisions would have to be made and gave the Commission considerable guidance, if not complete answers.  While Congress might be faulted, as Justice Scalia suggested, for not making all the hard policy choices, Congress expressed its views on the main issues and instructed the Commission on what to consider in resolving them.  That surely cannot be said about section 232, which places no restraints on the President's discretion to determine when imports of a product such as steel present a national security threat or on his ability to impose tariffs or quotas of unlimited amount, scope, and duration, in response.  Put another way, if Congress had provided the kind of directions in section 232 that it included in the SRA, there would be no basis for a delegation challenge.

*Whitman* is the Court's most recent significant discussion of the nondelegation doctrine, and, because of the fundamental differences between the portion of the Clean Air Act, 42 U.S.C § 7401 *et seq.* (CAA), at issue there and section 232, there is nothing in Justice Scalia's opinion there that undermines Plaintiffs' claim here.  The objection raised in *Whitman* was that the EPA was required to, but had not, factored in costs in the rule it finally issued, and like the plaintiffs in

*Algonquin*, the private parties raised the delegation claim as a means to their end of validating their objection.  But in both cases, the Court addressed the statutory objection and rejected the claim on the merits.

This is how the Court described the delegation argument in *Whitman*:

Section 109(b)(1) of the CAA instructs the EPA to set "ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on [the] criteria [documents of § 108] and allowing an adequate margin of safety, are requisite to protect the public health." The Court of Appeals held that this section as interpreted by the Administrator did not provide an "intelligible principle" to guide the EPA's exercise of authority in setting NAAQS. "[The] EPA," it said, "lack[ed] any determinate criteria for drawing lines. It has failed to state intelligibly how much is too much."  The court hence found that the EPA's interpretation (but not the statute itself) violated the nondelegation doctrine. We disagree.

*Whitman*, 531 U.S. at 472 (alterations in original) (citations omitted).  That claim of improper delegation would be comparable to a claim here that Congress failed only in its duty to tell the President how much of a tariff increase was allowed, which is only one very small portion of Plaintiffs' delegation claim here.

As the Court further explained:

Section 109(b)(1) of the CAA, which to repeat we interpret as requiring the EPA to set air quality standards at the level that is "requisite"—that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety, fits comfortably within the scope of discretion permitted by our precedent.

*Id.* at 475-76.  Nothing in *Whitman* rejecting a delegation claim limited to one determination left to the EPA suggests that the Court would be willing to tolerate a law like section 232 that leaves wide open all of the significant questions that must be answered in determining how to respond to threats that imports of steel may impair the national security as broadly encompassed by section 232(d).  Moreover, this case plainly falls on the "substantial" side of the line that the Court drew when it ruled that Congress "must provide substantial guidance on setting air standards that affect the entire national economy," but that far less guidance is necessary when

the Executive determines relatively minor matters, like the definition of "country elevators." *Id.* at 475.[13]

Two other cases that were not decided on delegation grounds point up related constitutional concerns that support Plaintiffs' claim here.  The first of these, *Clinton v. City of New York*, 524 U.S. 417 (1998), involved a situation very similar to this in many respects.  A statute delegating broad lawmaking powers to the President was struck down, albeit not on improper delegation grounds.  The statute was called the Line Item Veto Act after provisions in many state constitutions that authorized the Governor to veto specific items in bills passed by the legislature, while signing the remainder of the bill into law.  Everyone agreed that under Article I, section 7 of the Constitution (the "Presentment Clause") an explicit line item veto would be unconstitutional, and the Act was an effort to accomplish the same end by alternative means.  Under the Act, the President had only five days to "cancel" separate items of spending or certain tax expenditures (reductions in revenue included in the Internal Revenue Code), and he could do so only if he made three findings about the cancellation:  that it will "(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest." *Clinton*, 524 U.S. at 436.  The first is automatic assuming there is a deficit, and the other two are, in effect, licenses for the President to disagree with the policy judgments made by Congress in including them in the bill which is presented for his approval.  The majority concluded that the Act was an attempt to do indirectly what everyone agreed could not be done and directly inconsistent with the Presentment Clause and was therefore unconstitutional:  the

---

[13] There was no claim in *Whitman* that the substances subject to the EPA's rules were uncertain, and hence that Congress had failed to define the triggering facts with reasonable precision, as is the problem with the all-inclusiveness that Congress has employed for national security in section 232.

President cannot change or "effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7." *Id.* at 445.

If the Line Item Veto Act were examined through the delegation lens presented by Plaintiffs in this case (which is what Justice Breyer did in his dissent), the constitutional outcome would be the same, although in some respects, the delegation there was more restricted than in section 232.  For example, Congress had significant control over the triggers because the Act applied only to separate items, and Congress could in most cases combine items together to make it more difficult for the Act to be invoked.  The President had only five days to make a cancellation, and the only remedy that he had was to cancel the entire item, whereas under section 232 the President has a choice of remedies among tariffs, quotas, and licensing fees, with no caps on the amounts that he can impose for any of them.  And under both that Act and section 232 here, the effect of the President's action is to change the law from what it was by cancelling (eliminating) a portion of the spending law he just signed, and in this case creating tariffs where none previously existed.  On the other side, the "not impair any essential government functions" and "not harm the national interest" conditions may give the President even more discretion than the license in section 232(d) to "determine the nature and duration of the action that, in [his] judgment . . . must be taken to adjust the imports of [steel] and its derivatives so that such imports will not threaten to impair the national security."  Formal doctrines aside, the Line Item Veto Act was held unconstitutional for the same basic reason that Plaintiffs urge this Court to strike down section 232:  they both attempt to transfer to the President the authority to make law and not just implement it, because in both cases Congress surrendered essential policymaking functions to the President without intelligible principles to reign in his unbridled discretion.  Similarly, as the Court of Customs and Patent Appeals observed in a delegation challenge to a

different trade statute, "Congress cannot abdicate its legislative function and confer carte blanche authority on the President." *Star-Kist Foods, Inc. v. United States*, 275 F.2d 472, 480 (C.C.P.A. 1959).

The other Supreme Court ruling relevant to nondelegation is *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). In a series of recent opinions, the Court had found the residual clauses in a number of criminal sentencing statutes unconstitutional on the ground that they were void for vagueness.[14] *Sessions* involved a similar residual clause in a statute that removed the discretion of the Attorney General not to deport an otherwise deportable non-citizen if he or she had committed offenses within that clause, and the Court struck it down as unconstitutionally vague. In doing so, the Court note that "the doctrine is a corollary of the separation of powers— requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Id.* at 1212. In his concurring opinion, Justice Gorsuch made an additional connection between the void for vagueness and the separation of powers flaws. In both situations Congress abdicated its responsibility to make the law; in the vagueness cases by asking the courts to cure the deficiency, and in the delegation cases, by transferring to the President or others in the Executive Branch the power to do what Congress failed to do.

> It is for the people, through their elected representatives, to choose the rules that will govern their future conduct. . . . That power does not license judges to craft new laws to govern future conduct, but only to "discer[n] the course prescribed by law" as it currently exists and to "follow it" in resolving disputes between the people over past events.

*Id.* at 1227 (Gorsuch, J., concurring) (second alteration in original). And, although he dissented, Justice Thomas made the same connection between the two legal doctrines: "perhaps the

---

[14] All of those statutes contained some provisions that were perfectly clear and hence enforceable. Accordingly, the fact that a delegation challenge to one portion of section 232 failed in *Algonquin*, does not doom this very different challenge here.

vagueness doctrine is really a way to enforce the separation of powers—specifically, the doctrine of nondelegation.  See Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1806 (2012) ('Vague statutes have the effect of delegating lawmaking authority to the executive')."  *Id.* at 1248 (Thomas, J., dissenting).

***

The viability of an unconstitutional delegation argument does not depend on broad statements of legal conclusions in judicial opinions, but on the specifics of the statute being challenged and the basis of that challenge.  No case of which Plaintiffs are aware, with a remotely comparable statute, has rejected a delegation challenge to a statute like this, in which Congress abdicated its responsibility to establish the intelligible principles required by the Supreme Court for both the trigger finding and to limit the available remedies.  Moreover, not only does section 232 lack intelligible principles, but there is neither any judicial review nor are there any other vital procedural protections to assure that the President obeys the expressed will of Congress.  For those reasons and others set forth above, section 232 violates both the prohibition against granting legislative powers to the President and the system of separation of powers and checks and balances in the Constitution.

**<u>CONCLUSION</u>**

Plaintiffs' Motion for Summary Judgment should be granted, and the Court should enter

Plaintiffs' Proposed Order declaring section 232 and Proclamation No. 9705 unconstitutional and

enjoining defendants from enforcing the 25% tariff on imported steel products based on it.

Respectfully submitted,

/s/Donald B. Cameron
Donald B. Cameron
R. Will Planert
Julie C. Mendoza
Brady W. Mills
MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811
dcameron@mmmlaw.com

/s/Alan B. Morrison
Alan B. Morrison
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

/s/Gary N. Horlick
Gary N. Horlick
Law Offices of Gary N. Horlick
1330 Connecticut Ave., NW, Suite 499c
Washington, D.C. 20036
(202) 429-4790
gary.horlick@ghorlick.com

/s/Timothy Meyer
Timothy Meyer
Vanderbilt Law School
131 21st Avenue South
Nashville, TN 37203
(615) 936-8394
tim.meyer@law.vanderbilt.edu

/s/ Steve Charnovitz
Steve Charnovitz
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7808
scharnovitz@law.gwu.edu

July 19, 2018                    *Counsel to Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 13,835 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2010 used to prepare this brief.

**/s/ Donald B. Cameron**