IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, and KURT ORBAN PARTNERS, LLC, | ) | |
| Plaintiffs, | ) | Court No. 18-00152 |
| v. | ) | |
| UNITED STATES and KEVIN K. MCALEENAN, Commissioner, United States Customs and Border Protection, | ) | |
| Defendants. | ) | |

DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

JOSEPH H. HUNT
Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

JOSHUA E. KURLAND
STEPHEN C. TOSINI
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-2228
E-mail: Tara.Hogan@usdoj.gov

November 9, 2018

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE**

DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS ..... 1

ARGUMENT ..... 2

I. *Algonquin* Is Binding Supreme Court Authority That Requires Dismissal Of The Complaint ..... 2

II. Congress Has Delegated Power To The President Consistent With The "Intelligible Principle" Standard ..... 5

III. The President's Independent Authority In Matters of National Security And Foreign Affairs Is Relevant To The Non-Delegation Inquiry ..... 11

IV. The Limited Availability Of Judicial Review Does Not Alter the Constitutional Analysis ..... 14

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*A. L. A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)....11

*Agostini v. Felton*,
521 U.S. 203 (1997)....5

*Am. Power & Light Co. v. Secs. & Exch. Comm'n*,
329 U.S. 90 (1946)....5, 9, 15

*Clinton v. City of New York*,
524 U.S. 1417 (1998)....5

*Dalton v. Spencer*,
511 U.S. 462 (1994)....4, 16

*Faucher v. Federal Election Com.*,
928 F.2d 468 (1st Cir. 1991)....3

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976)....2, 3, 6, 7, 9

*Field. v. Clark*,
143 U.S. 649 (1892)....7

*Florsheim Shoe Co. v. United States*,
744 F.2d 787 (Fed. Cir. 1984)....15

*Freedom to Travel Campaign v. Newcomb*,
82 F.3d 1431 (9th Cir. 1996)....12

*Haig v. Agee*,
453 U.S. 280 (1981)....16

*Heckler v. Cheney*,
470 U.S. 821 (1985)....16

*Independent Gasoline Marketers Council, Inc. v. Duncan*,
492 F. Supp. 614 (D.D.C. 1980)....8

*Industrial Union Dept., AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980)....14, 15

*Ins. Co. of the West v. United States*,
243 F.3d 1367 (Fed. Cir. 2001)....................3

*J.W. Hampton, Jr. Co. v. United States*,
276 U.S. 394 (1928)....................1

*Loving v. United States*,
517 U.S. 748 (1996)....................12, 13

*Mistretta v. United States*,
488 U.S. 361 (1989)....................5, 7, 11

*Motion Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006)....................16

*Norwegian Nitrogen Products Co. v. United States*,
288 U.S. 294 (1933)....................13

*Owens v. Republic of Sudan*,
531 F.3d 884 (D.C. Cir. 2008)....................11

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)....................11

*Reynolds v. United States*,
565 U.S. 432 (2012)....................2

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018)....................5

*Skinner v. Mid-America Pipeline Co.*,
490 U.S. 212 (1989)....................17

*South Puerto Rico Sugar Co. Trad. Corp. v. United States*,
334 F.2d 622 (Ct. Cl. 1965)....................10

*Star-Kist Foods, Inc. v. United States*,
275 F.2d 472 (C.C.P.A. 1959)....................8

*Touby v. United States*,
500 U.S. 160 (1991)....................10, 15

*United States v. Bozarov*,
974 F.2d 1037 (9th Cir. 1992)....................15, 16, 17

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950)....................15

*United States v. Curtiss-Wright Corp.*,
299 U.S. 304 (1936)....................11, 13

*United States v. George S. Bush & Co.*,
310 U.S. 371 (1940)....................4

*United States v. Mazurie*,
419 U.S. 544 (1975)....................12

*United States v. Yoshida Int'l*,
526 F.2d 560 (C.C.P.A 1975) ....................8, 9, 10, 13

*Whitman v. Am. Trucking Assns*,
531 U.S. 457 (2001).................... passim

*Yakus v. United States*,
321 U.S.414 (1944)....................8, 10, 15

*Zemel v. Rusk*,
381 U.S. 1 (1965)....................4

**STATUTES**

19 U.S.C. § 1862....................1, 12

19 U.S.C. § 1862(b)(1)(A)....................6

19 U.S.C. § 1862(b)(2)(A)....................6

19 U.S.C. § 1862(c)(1)(ii)....................12, 13

19 U.S.C. § 1862(c)(i)(A) ....................6, 7

19 U.S.C. § 1862(c)(i)(B) ....................7

19 U.S.C. § 1862(d) ....................7, 13

50 U.S.C. § 2170(b)(1)(A)....................13

50 U.S.C. § 2170(d)(1)(2)....................13

**RULES**

Rule 12(c)....................1

**LEGISLATIVE HISTORY**

Pub. L. No. 85–686, 72 Stat. 673 (1958) ....................13

S. Rep. No. 85-1838, 85th Cong. 2d Sess. (1958) ....................6, 13

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, and KURT ORBAN PARTNERS, LLC, | ) | |
| Plaintiffs, | ) | Court No. 18-00152 |
| v. | ) | |
| UNITED STATES and KEVIN K. MCALEENAN, Commissioner, United States Customs and Border Protection, | ) | |
| Defendants. | ) | |

DEFENDANTS' REPLY
IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to United States Court of International Trade Rule 12(c) and the Court's order dated October 16, 2018, defendants, the United States and Kevin K. McAleenan, Commissioner of U.S. Customs & Border Protection, respectfully submit this reply in support of our motion for judgment on the pleadings.

It is well settled that Congress may delegate authority to another branch of Government as long as it provides "an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr. Co. v. United States*, 276 U.S. 394, 409 (1928). While plaintiffs propose that the Court bifurcate its analysis in a manner never sanctioned by the Supreme Court, plaintiffs nonetheless do not dispute that *Hampton* provides the governing standard. Pl. Resp. at 8, 16. And, as the Supreme Court has already recognized, Section 232 of the Trade Expansion Act of 1962, 19 U.S.C.

§ 1862, readily satisfies the "intelligible principle" test. *Federal Energy Admin. v. Algonquin SNG, Inc*., 426 U.S. 548, 558-60 (1976).

Even if this case were a close one (and it is not), the limits on Congress's delegation power are less stringent where the President has independent constitutional authority over the subject matter by virtue of his foreign affairs powers. Finally, while plaintiffs correctly observe that judicial review of the President's exercise of discretion is unavailable, that has no bearing on the analysis of whether Section 232 is a permissible delegation of authority to the President. Plaintiffs' contrary argument lacks merit.

## ARGUMENT

### I. *Algonquin* Is Binding Supreme Court Authority That Requires Dismissal Of The Complaint

The Supreme Court has already answered the sole question raised in plaintiffs' complaint: whether Section 232 constitutes a permissible delegation of authority to the President. Not only did the Supreme Court conclude that Section 232's standards are "clearly sufficient to meet *any* delegation doctrine attack," *Algonquin*, 426 U.S. at 559 (emphasis added), the Court signaled that the question was not a close one. According to the Court, Section 232 "easily fulfills" the intelligible principle test. *Id*. *Algonquin* alone requires judgment in the Government's favor.

Faced with this case-dispositive precedent, plaintiffs attempt to recast the issue resolved in *Algonquin* as a narrow statutory one. Pl. Resp. at 4-6.[1] As we previously

[1] Plaintiffs' analogy of its claim and the *Algonquin* decision to *Reynolds v. United States*, 565 U.S. 432 (2012), and a case pending before the Supreme Court, *Gundy v. United States*, No. 17-6086, is not apt. Pl. Resp. at 6. Plaintiffs argue that the Supreme Court's examination of whether the Sex Offender Registration and Notification Act applied to certain individuals in *Reynolds* did not preclude a subsequent challenge to the

explained, Def. Mot. at 20-21, the Supreme Court decided the very constitutional question raised here. In the first section of its analysis, the Court framed the issue using nondelegation terms, analyzed it under the "intelligible principle" test articulated in *J.W. Hampton*, and resolved the question in unmistakable nondelegation terms, holding that "the standards that [the statute] provides the President in its implementation are clearly sufficient to meet any delegation doctrine attack." 426 U.S. at 559.

Nor was the Court's nondelegation discussion *dictum*, as plaintiffs and amicus suggest. *See* Pl. Mot. at 29; Basrai Farms Amicus Br. at 7 n. 2. Because the Court interpreted Section 232 to authorize the President's license fees, the Court was obligated, given plaintiffs' arguments, to explain why its interpretation of Section 232 would not raise a nondelegation problem. Had the Court instead concluded that Section 232 did not authorize the license fees, the nondelegation discussion would have been unnecessary. Regardless of how one characterizes the Supreme Court's analysis, *Algonquin* is binding authority that entitles the Government to judgment on the pleadings. *See, e.g., Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001); *Faucher v. Federal Election Com.*, 928 F.2d 468, 470 (1st Cir. 1991) (in holding that it was bound to follow the Supreme Court's *dictum*, explaining that "[w]e cannot accept that in resolving constitutional issues . . . the Supreme Court proclaims the law lightly").

Plaintiffs also seek to distinguish *Algonquin* on the basis that this case does not involve the President's use of an import licensing scheme such as that challenged in *Algonquin*. Plaintiffs also argue that the remedies selected by the President allegedly

---

statute on nondelegation grounds. The difference is, of course, that the *Algonquin* court squarely resolved the nondelegation challenge plaintiffs have brought.

have had "very significant adverse impacts." Pl. Resp. at 5-6; *see also* Basrai Br. at 1; 11-15. These arguments are not relevant to resolve what plaintiffs themselves characterize as a "facial non-delegation challenge" to the statute. Pl. Resp. at 6; *see also* Compl. Introd.; ¶ 32.

"In a delegation challenge, the constitutional question is whether the *statute* has delegated legislative power to the agency." *Whitman v. Am. Trucking Assns*, 531 U.S. 457, 472 (2001) (emphasis added); *see also Zemel v. Rusk*, 381 U.S. 1, 6 (1965) ("in arguing invalid delegation, appellant has quite clearly assailed the statutes themselves"). Resolution of plaintiffs' suit turns on the text and purpose of the statute because, as plaintiffs concede, Pl. Resp. at 7 n.2, even a narrow implementation of a statute cannot salvage an unconstitutional delegation.

Nor is there any intervening change in the law that would permit this Court to ignore *Algonquin*. Plaintiffs suggest that this Court may disregard *Algonquin* because of the Supreme Court's subsequent decisions in *Dalton v. Spencer* and *Franklin v. Massachusetts*, which affirmed that judicial review of the President's discretionary determinations is unavailable. Pl. Resp. at 7. As we have explained, and plaintiffs have not rebutted, even before *Algonquin*, the President's discretionary determinations generally were not susceptible to judicial review. Def. Mot. at 32-33 (citing *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-81 (1940)).

This point is confirmed by the very case relied upon by the plaintiffs: "[*L]ongstanding authority* holds that" judicial review of a claim that "the President has violated a statutory mandate" "is not available when the statute in question commits the decision to the discretion of the President." *Dalton v. Spencer*, 511 U.S. 462, 474 (1994)

(emphasis added). And, as we demonstrate in Section IV, the Supreme Court has never found the availability of judicial review to be relevant to the "intelligible principle" analysis. But even if it had, it is for the Supreme Court, not this Court, to revise its precedents in light of subsequent developments in the law: "[i]f a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [subordinate court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Until and unless that happens, *Algonquin* controls the disposition of this case.

## II. Congress Has Delegated Power To The President Consistent With The "Intelligible Principle" Standard

Even if the Court were to accept plaintiffs' invitation to reexamine Section 232 under nondelegation principles, the Court must still grant judgment in defendants' favor. Applying the "intelligible principle" standard, the Supreme Court has "deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (citing *Am. Power & Light Co. v. Secs. & Exch. Comm'n*, 329 U.S. 90, 105 (1946)). To identify the general policy and boundaries of a delegation, the Court may examine both the statutory language as well as the "purpose of the Act, its factual background and the statutory context in which they appear." *Am. Power & Light*, 329 U.S. at 104.[2]

[2] Acknowledging that neither decision addressed the nondelegation doctrine, plaintiffs nonetheless criticize the government for not addressing *Clinton v. City of New York*, 524 U.S. 417 (1998) or *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Pl. Resp. at

Section 232 contains a "clearly delineate[d] general policy": to avert the impairment of national security by adjusting imports of any articles that are found to impair, or threaten to impair, national security. The legislative history of the predecessor statute explained that it was "designed to give the President unquestioned authority" to take action "whenever danger to our national security results from a weakening of segments of the economy through injury to any industry, whether vital to the direct defense or a part of the economy providing employment and sustenance to individuals or localities." S. Rep. No. 85-1838, 85th Cong. 2d at 5-6. Although the plaintiffs dispute that Congress has articulated a general policy, Pl. Resp. at 8, the statute clearly conveys Congress's objective.

As to the third prong, Congress has identified "clear preconditions to Presidential action." *Algonquin*, 426 U.S. at 559. The President may act only upon receiving a report and recommendation from the Secretary of Commerce following an "investigation to determine the effects on the national security of imports of [an] article." 19 U.S.C. § 1862(b)(1)(A). In conducting the investigation, the Secretary of Commerce must consult with the Secretary of Defense and other appropriate United States officials, as well as (if appropriate) hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to the investigation. *Id.* § 1862(b)(2)(A). Within 90 days of receiving the report, the President must determine whether he concurs in the Secretary's finding. *Id.* § 1862(c)(1)(A)(i). If the President concurs in the Secretary's finding, and determines to adjust imports, the President must

15-16. We do not dispute the general separation of powers principle for which plaintiffs cite these decisions.

implement that action within 15 days. *Id*. § 1862(c)(i)(B). The clarity of these preconditions cannot be meaningfully distinguished from the precondition that the President be "satisfied" that a foreign government was imposing "duties or other exactions" on products of the United States, which the President "deem[ed] to be reciprocally unequal and unreasonable" found to be constitutional in *Marshall Field v. Clark*, 143 U.S. 649, 683 (1892). *See* Pl. Resp. Br. at 13-14; Basrai Br. at 8.

Further, Congress has articulated guidance for the President's exercise of authority that is "sufficiently specific and detailed to meet constitutional requirements." *Mistretta*, 488 U.S. at 374. Congress provided "a series of specific factors to be considered by the President in exercising his authority under § 232([c])." *Algonquin*, 426 U.S. at 559. Those factors are detailed, and include the domestic production needed for projected defense requirements, the capability of domestic industries to meet such requirements, and the import of goods affecting such industries. 19 U.S.C. § 1862(d).

Section 232 also guides the President's selection of the appropriate measures to address the national security threat. *See* Pl. Resp. at 10-11. The President is limited to taking actions that, in his judgment, "must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(i)(A)(ii). This is not the same as delegating authority to take *any* action, *see* Pl. Resp. at 2-3; Basrai Br. at 3. While Section 232 grants significant discretion to the President in making his national security determinations and in the selection of measures to address national security threats, the Supreme Court specifically concluded that this "leeway . . . is far from unbounded." *Algonquin*, 426 U.S. at 560.

That conclusion is further illustrated by *Independent Gasoline Marketers Council, Inc. v. Duncan*, 492 F. Supp. 614, 621 (D.D.C. 1980). There, the District Court for the District of Columbia set aside a conservation tax imposed on all oil, reasoning that Section 232's authorization to adjust imports did not "authorize the President to impose general controls on domestically produced goods either through a monetary mechanism or through a quantitative device." *Id*. at 618. But so long as the President's actions have the effect of "adjust[ing] imports," the President's flexibility to select the best tools, including the ability to treat imports from different foreign countries differently, does not render the delegation boundless.

Plaintiffs posit that courts have never "sanctioned a delegation of this breadth." Pl. Resp. at 13. Setting aside *Algonquin*, which sanctioned the very statute challenged here, our opening brief provided examples of statutory delegations phrased in "sweeping terms," *Am. Trucking*, 531 U.S. at 474, which were upheld against nondelegation challenges. Def. Mot. at 16-17. Plaintiffs seek to distinguish some of these statutes on the basis that the Executive's authority to act in those instances was contingent upon "objective factors," Pl. Resp. at 9-11. But even plaintiffs acknowledge that the guidelines set forth by Congress need not "be precise or mathematical formulae to be satisfactory in a constitutional sense." *Star-Kist Foods, Inc. v. United States*, 275 F.2d 472, 481 (C.C.P.A. 1959). Nor is Congress "confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus v. United States*, 321 U.S.414, 425-26 (1944).

*United States v. Yoshida International* demonstrates how broad a delegation may be and still meet the "intelligible principle" standard. 526 F.2d 560 (C.C.P.A 1975).

*Yoshida* addressed the President's authority to act under the Trading With the Enemy Act (TWEA), which was conditioned on either the existence of war or a Presidential declaration of national emergency. 526 F.2d at 573. The statute authorized the President to "prevent" or "prohibit" the importation of "any" property in which "any" foreign country or a national thereof has "any" interest under "any" rule he prescribes, by means of instructions, licenses, "or otherwise." *Id*. To address the economic crisis in 1971, President Nixon declared a period of national emergency and imposed a ten percent import duty under TWEA. Plaintiff, an importer of zippers from Japan, challenged the duty.

The U.S. Court of Customs and Patent Appeals rejected Yoshida's challenge that TWEA was an unconstitutional delegation of Congress' authority to regulate foreign commerce. 526 F.2d at 584. The court found that the delegation, while broad, identified the constitutionally necessary boundaries—namely, the preconditions for Presidential action. Further, the delegation was to "regulate importation" through "instructions, licenses, or otherwise", *id*. at 573, a delegation analogous to taking "action . . . to adjust the imports of the article." Thus, plaintiffs fail to meaningfully distinguish *Yoshida*. *See* Pl. Resp. at 9-10.

Plaintiffs complain that Section 232(d)'s direction that the President should not exclude "other relevant factors" when making his national-security determination renders Congress's delegation limitless. Pl. Resp. at 10. But common sense and "[n]ecessity . . . fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules." *Algonquin*, 426 U.S. at 560 (citing *Am. Power & Light*, 329

U.S. at 105). The impracticability of imposing detailed rules or formulas in the areas of foreign relations and national security is obvious.

Particularly where, as here, the statute deals with national security and foreign affairs, even "a grant to the President which is expansive to the reader's eye should not be hemmed in or 'cabined, cribbed, confined' by anxious judicial blinders." *Yoshida Int'l*, 526 F.2d at 571 (citing *South Puerto Rico Sugar Co. Trad. Corp. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1965)).

Moreover, the constitutionality of a delegation "depends not upon the breadth of the definition of the facts or conditions upon which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will." *Yakus*, 321 U.S. at 414. Section 1862(d) limits the President's consideration to factors that are relevant to the impairment of national security.

Plaintiffs' other complaint is that Congress did not specifically direct the President to examine "the inevitable impacts" the action might have on other aspects of the domestic economy. Pl. Resp. at 12-13. But their plea that additional factors or constraints would help the President make a more informed decision is not a constitutional problem, but a "challenge[ to] the wisdom of a legitimate policy judgment made by Congress," *Touby v. United States*, 500 U.S. 160, 168 (1991). And the Supreme Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Am. Trucking*, 531 U.S. at 474-75 (quotation omitted).

*American Trucking* underscores the permissibility of broad delegations to the Executive that have the potential to impact the national economy. The delegation there was a grant of authority to the Administrator of the Environmental Protection Agency to set national ambient air quality standards for crucial air pollutants, authority with extensive ramifications for public health and an equally enormous impact on the economy. 531 U.S. at 475. The Supreme Court did not express any concern about the scope of the authority delegated, after concluding that the legislation contained a sufficient intelligible principle. The Court noted that "even in sweeping regulatory schemes we have never demanded that statutes provide a 'determinative criterion' for saying 'how much [of the regulated harm] is too much." *Id.*

In contrast, Section 232's delegation bears no resemblance to the provisions found to violate the nondelegation doctrine in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). *See* Basrai Br. at 6-10. The fatal flaw the Court identified in each provision was that "Congress had failed to articulate *any* policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power." *Mistretta*, 488 U.S. at 373 n.7 (emphasis added). In light of the clear policy to protect national security, the procedural requirements and the extensive list of factors Congress provided in Section 232(d), the statute sufficiently cabins the President's discretion to comply with the nondelegation doctrine.

## III. The President's Independent Authority In Matters of National Security And Foreign Affairs Is Relevant To The Non-Delegation Inquiry

The President's independent constitutional authority over the subject matter covered by Section 232 further confirms the constitutionality of the statute. In our

opening brief, we explained that heightened deference is owed to congressional delegations touching on foreign affairs and national security. Def. Mot. at 27-30. Plaintiffs dispute the relevance of the President's independent authority to their non-delegation challenge. Pl. Resp. at 15, 19. In so doing, plaintiffs ignore the Supreme Court's recognition that the limits on Congress's delegation power are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975); *see Loving v. United States*, 517 U.S. 748, 772-73 (1996).

Thus, even a delegation to the Executive that might otherwise be improper if confined to internal affairs may "nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory." *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 315 (1936); *see also Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1438 (9th Cir. 1996) (same); *Owens v. Republic of Sudan*, 531 F.3d 884, 891 (D.C. Cir. 2008) (same).

Seeking to avoid this principle, plaintiffs dispute Section 232's nexus to foreign affairs or national security. Plaintiffs argue instead that "the focal point of section 232 is the protection of the domestic industry." Pl. Resp. at 13; *see also* Basrai Br. at 10-11. Any claim that Section 232 is directed solely to domestic affairs or economic policy is easily dispatched. The statute, entitled "Safeguarding national security," requires the Secretary and the President to determine whether imports of an article are impairing, or threatening to impair, "national security." 19 U.S.C. § 1862. If the President reaches that conclusion, the President is directed to take action to adjust imports of articles that "threaten to impair the national security." *Id.* § 1862(c)(1)(ii).

Beyond the recognition of the economy as the obvious source of funds, materiel, and personnel for national defense needs, Congress understood the close link between national security and the health of our national economy (and, in particular, domestic production of certain articles). Section 232(d) makes that nexus explicit by requiring the President to consider "the close relation of the economic welfare of the Nation to our national security." In enacting Section 232's predecessor, Section 8 of the Trade Agreement Extension of 1958, Pub. L. No. 85–686, 72 Stat. 673, 678 (1958), which included the economic factors now codified at 19 U.S.C. § 1862(d), Congress signaled that "the President must take into consideration the effect on the national security of a weakening of the general economy by excessive imports of competitive products." S. Rep. No. 85-1838, 85th Cong. 2d Sess. at 2 (1958) (emphasis added).[3] To the extent that plaintiffs dispute Congress's recognition in Section 232(d) that "national security" is linked to the health of our national economy, Pl. Resp. at 3, they ask this Court to second-guess Congress's judgment and guidance to the President in making a national security determination.

Further, adjustment of imports (the action that Section 1862(c)(1)(ii) authorizes the President to take) necessarily implicates the President's independent foreign affairs authority. *Curtiss-Wright Export Corp*., 299 U.S. at 320; *Norwegian Nitrogen Products*

[3] The nexus between national security and the health of the domestic economy is further illustrated by another statute, the Defense Production Act of 1950. That statute authorizes the President to review certain business transactions with foreign nationals "to determine the effects of the transaction on the national security of the United States." 50 U.S.C. § 2170(b)(1)(A). Directing the Executive to evaluate some of the same factors as set forth in Section 232, Congress authorizes the President to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id*. § 2170(d)(1), (2).

*Co. v. United States*, 288 U.S. 294, 305 (1933); *Yoshida*, 526 F.2d at 580 ("That the surcharge herein had overtones of foreign relations and foreign policy seems self-evident"). Plaintiffs' characterization of the delegated power as the power to set tariffs, Pl. Resp. at 15, is inconsistent with the language of the statute.

## IV. The Limited Availability Of Judicial Review Does Not Alter the Constitutional Analysis

The lack of judicial review over the President's discretionary determinations in matters of foreign affairs and national security fails to create a nondelegation problem. Pl. Resp. at 17-21. The only constitutional requirement is that *Congress* provide an intelligible principle to guide the exercise of the delegated authority. *Am. Trucking*, 531 U.S. at 472. That is because the nondelegation doctrine derives from "the understanding that Congress may not delegate the power to make laws." *Loving*, 517 U.S. at 771. Whether or not a given power is "legislative" or constitutes "the power to make laws" under Article I of our Constitution has nothing to do with whether the exercise of that power is subject to judicial (or any other) review.

Without clearly articulating the connection, plaintiffs assert that the availability of judicial review is "important" to the nondelegation inquiry. Pl. Resp. at 19. Plaintiffs rely upon *American Power & Light* and Justice Rehnquist's concurrence in *Industrial Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686 (1980). But neither case held that judicial review is invariably necessary for a conferral of authority on the Executive Branch to be constitutional.

*Industrial Union* was not decided on nondelegation grounds, but because the agency action exceeded its statutory authority. 448 U.S. at 659. Justice Rehnquist concurred in the judgment, because he would have found that the statute was an

unconstitutional delegation of authority. 448 U.S. at 672. Justice Rehnquist explained that a "derivative" function of the nondelegation doctrine was to "ensure[] that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *Id*. at 686. Similarly, the Court in *American Power & Light* observed that the articulation of guidance and standards can facilitate judicial review. 329 U.S. at 105. But in neither decision did the constitutionality of the statute hinge on the availability of judicial review.

Plaintiffs further assert that, "in virtually every case in which there has been a delegation challenge, judicial review of the merits . . . ha[s] been available." Pl. Resp. at 18. Plaintiffs fail to take account of cases upholding broad delegations of authority, even when judicial review was not available. In *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), the Supreme Court upheld the statutory grant of authority to the President, delegated to the Attorney General, to impose restrictions and prohibitions on persons' entry into and departure from the United States when he determined that the public interest of the United States so required. 338 U.S. at 543-44. The Court concluded that Congress's broad authorization was constitutionally acceptable, even though the Executive's exclusion decisions applying that standard were not subject to judicial review. *Id*. at 543. Similarly, the Federal Circuit sustained a statute as a constitutional delegation of authority to the President, while at the same time acknowledging that the President's discretionary determination was not subject to judicial review. *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 796 (Fed. Cir. 1984).

Judicial review can provide an important "check" on the power delegated by Congress. Pl. Resp. at 19; *see Touby*, 500 U.S. at 167-69. But that "check" may also be accomplished by Congress itself. *Yakus*, 321 U.S. at 426 ("[t]he standards prescribed by the Act … are sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator . . . has conformed" to them). In other words, the intelligible principle test facilitates accountability generally, even if judicial review is limited or unavailable. Even where judicial review is available, that check has never encompassed second-guessing the President's discretionary determinations. Pl. Resp. at 20.

Plaintiffs argue that "there is no case in which judicial review of the significant discretionary determinations, such as those made by the President under section 232, has been precluded and a court has concluded that such preclusion is of no significance." Pl. Resp. at 18-19. But a substantial body of law recognizes that the Executive's discretionary determinations, particularly in the areas of foreign affairs and national security, may not be subject to judicial review. *See, e.g., Heckler v. Cheney*, 470 U.S. 821, 830 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."); *Dalton*, 511 U.S. at 462; *Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters closely related to national security are "rarely proper subjects for judicial intervention"); *see also Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (*en banc*). In none of those cases did the Supreme Court find that the absence of judicial review created a constitutional problem.

The Ninth Circuit has rejected an argument very similar to that raised by the plaintiffs. In *United States v. Bozarov*, the defendant was charged with exporting software equipment without an export license, in violation of the Export Administration Act. 974 F.2d 1037, 1039 (9th Cir. 1992). The Export Administration Act authorized the Department of Commerce to set export controls and to issue licenses for exports. Judicial review of Commerce's actions taken under the Act was explicitly precluded. *Id.*

The defendant challenged the Export Administration Act as an unconstitutional delegation of legislative authority, identifying the lack of judicial review as a basis for its challenge. 974 F.2d at 1041. Reviewing Supreme Court decisions addressing statutes that precluded judicial review, as well as the Administrative Procedure Act itself, the court noted that "the fact that the [Supreme] Court and Congress both accept that judicial review may be unavailable at least suggests that the availability of review is not always a constitutional necessity." *Id*. at 1042. The court also found nothing in cases such as *Yakus*, *Touby*, and *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 218 (1989) that could be read to stand for the "proposition that judicial review is always constitutionally required" to survive a nondelegation challenge. *Id.* The court further acknowledged that "broad delegations are appropriate in the foreign policy arena because of the political nature of the decisions and the compelling need for uniformity." *Bozarov*, 974 F.2d at 1044.

## CONCLUSION

For the reasons provided here and in our opening motion, we respectfully request that the Court enter judgment in favor of the defendants and dismiss the complaint.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

JOSHUA E. KURLAND
STEPHEN C. TOSINI
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-2228
E-mail: Tara.Hogan@usdoj.gov

November 9, 2018 Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief complies with the word-count limitation set forth in Standard Chambers Procedure ¶ 2(B)(1). In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief. According to the word count, this brief contains 4586 words.

s/Tara K. Hogan
TARA K. HOGAN
November 9, 2018