Slip Op. 19-37

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, and KURT ORBAN PARTNERS, LLC, | |
| Plaintiffs, | Before: Claire R. Kelly, Jennifer Choe-Groves & Gary S. Katzmann, Judges |
| v. | |
| UNITED STATES and KEVIN K. MCALEENAN, Commissioner, United States Customs and Border Protection, | Court No. 18-00152 |
| Defendants. | |

## OPINION

[Denying Plaintiffs' motion for summary judgment seeking a declaration that section 232 of the Trade Expansion Act of 1962 contains an impermissible delegation of legislative authority and granting Defendants' motion for judgment on the pleadings. Judge Katzmann files a separate dubitante opinion.]

Dated: March 25, 2019

Alan B. Morrison, George Washington University Law School, Donald Bertrand Cameron and Rudi Will Planert, Morris, Manning & Martin, LLP, of Washington, DC, and Gary N. Horlick, Law Offices of Gary N. Horlick, of Washington, DC argued for plaintiffs, American Institute for International Steel, Inc. a/k/a AIIS, Sim-Tex, LP, and Kurt Orban Partners, LLC. With them on the brief were Steve Charnovitz, George Washington University Law School, Julie Clark Mendoza and Brady Warfield Mills, Morris, Manning & Martin, LLP, of Washington, DC, and Timothy Lanier Meyer, Vanderbilt University Law School.

Tara Kathleen Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, and Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendants. With them on the brief were Joshua E. Kurland and Stephen C. Tosini, Attorneys, and Joseph H. Hunt, Assistant Attorney General.

Kelly, Judge:  Before the court are American Institute for International Steel, Inc.,

Sim-Tex LP, and Kurt Orban Partners, LLC's ("Plaintiffs") motion for summary judgment

and Defendants' motion for judgment on the pleadings, and their respective supporting

memoranda.  See [Plaintiffs'] Mot. Summary J. & Mem. Supp., July 19, 2018, ECF No.

20 ("Pls.' Br."); Defs.' Mot. J. Pleadings & Opp'n Pls.' Mot. Summary J., Sept. 14, 2018,

ECF No. 26 ("Defs.' Opp'n Br.").  Plaintiffs seek declaratory and injunctive relief against

enforcement of section 232 of the Trade Expansion Act of 1962, as amended 19 U.S.C.

§ 1862 (2012)[1] ("section 232"), on the grounds that, on its face, it constitutes an improper

delegation of legislative authority in violation of Article I, Section 1 of the U.S. Constitution

and the doctrine of separation of powers.[2]  See Pls.' Br. at 16–42; see also U.S. Const.

art. I, § 1.  Defendants argue that Plaintiffs' claim is foreclosed by Fed. Energy Admin. v.

Algonquin SNG Inc., where the Supreme Court stated that section 232's standards are

"clearly sufficient to meet any delegation doctrine attack."  Defs.' Opp'n Br. at 13 (quoting

Fed. Energy Admin. v. Algonquin SNG Inc., 426 U.S. 548, 559 (1976)).[3]  Alternatively,

Defendants argue that the statutory scheme "amply satisfies the nondelegation doctrine."

Id. at 14.

---

[1] Further citations to the Trade Expansion Act of 1962, as amended, are to the relevant provisions of the United States Code, 2012 edition.

[2] Basrai Farms appears as amicus curiae in this action and filed a brief in support of Plaintiffs' position and in opposition to Defendants' position.  See generally Br. Basrai Farms Opp'n Defs.' Mot. J. Pleadings & Supp. Pls.' Mot. Summary J., Oct. 5, 2018, ECF No. 39.

[3] American Iron and Steel Institute ("AISI") and Steel Manufacturers Association ("SMA") appear as amici curiae in this action and filed a brief in opposition to Plaintiffs' position.  See generally Br. Amici Curiae [AISI] & [SMA] Opp'n Pls.' Mot. Summary J., Sept. 14, 2018, ECF No. 30.

## BACKGROUND

Section 232 authorizes the Secretary of Commerce to commence an investigation "to determine the effects on the national security of imports" of any article. 19 U.S.C. § 1862(b)(1)(A). The Secretary of Commerce must "provide notice to the Secretary of Defense" of the investigation's commencement and, in the course of the investigation, "consult with the Secretary of Defense regarding the methodological and policy questions raised[.]" 19 U.S.C. § 1862(b)(1)(B); 19 U.S.C. § 1862(b)(2)(A)(i). The Secretary of Commerce must also "(ii) seek information and advice from, and consult with, appropriate officers of the United States, and (iii) if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation." 19 U.S.C. § 1862(b)(2)(A)(ii)–(iii). The Secretary of Defense shall also, if requested by the Secretary of Commerce, provide to the Secretary of Commerce "an assessment of the defense requirements of any article that is the subject of an investigation conducted under this section." 19 U.S.C. § 1862(b)(2)(B).

Upon the investigation's completion or within the timeline provided, the Secretary of Commerce must provide the President with a report of the investigation's findings, advise on a course of action, and if the Secretary determines that the article under investigation "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," advise the President of the threat. 19 U.S.C. § 1862(b)(3)(A).

After receiving the Secretary of Commerce's report, if the President concurs with the finding that a threat exists, he shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

> Additionally,
>
> By no later than the date that is 30 days after the date on which the President makes any determinations under paragraph (1), the President shall submit to the Congress a written statement of the reasons why the President has decided to take action, or refused to take action, under paragraph (1).

19 U.S.C. § 1862(c)(2).

Finally, section (d) lists the following factors that the Secretary and the President should consider when acting pursuant to the statute:

> (d) Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries
>
> For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment,

decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction under 28 U.S.C. § 1581(i)(2),(4) (2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the party is entitled to judgment as a matter of law." Forest Labs, Inc. v. United States, 476 F.3d 877, 881 (Fed. Cir. 2007) (citation omitted). Plaintiffs challenge the constitutionality of section 232. Compl. ¶ 11, June 27, 2018, ECF No. 10; Pls.' Br. at 3, 16–42. The issue of a statute's constitutionality is a question of law appropriate for summary disposition, which the court reviews "completely and independently." See, e.g., Demko v. United States, 216 F.3d 1049, 1052 (Fed. Cir. 2000).

## DISCUSSION

Article I, Section I of the U.S. Constitution provides that "all legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. The Supreme Court established the standard by which delegations are to be judged in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928), explaining that "[i]f Congress shall lay down by legislative act an intelligible principle to which the person

or body authorized to fix such rates is directed to conform, such legislative action is not a

forbidden delegation of legislative power."

Since 1935 no act has been struck down as lacking an intelligible principle.  See

Panama Refining Co. v. Ryan, 293 U.S. 388 (1935); A.L.A. Schechter Poultry Corp. v.

United States, 295 U.S. 495 (1935).   The Supreme Court has upheld delegations of

authority as sufficient to guide the executive branch where they contained standards such

as: regulating broadcast licensing as "public interest, convenience, or necessity" require,

National Broadcasting Co. v. United States, 319 U.S. 190, 225–26 (1943); ensuring that

a company's existence in a holding company does not "unduly or unnecessarily

complicate the structure" or "unfairly or inequitably distribute voting power among security

holders[,]" American Power & Light Co. v. SEC, 329 U.S. 90, 104–05 (1946); and setting

nationwide air-quality standards limiting pollution to the level required "to protect the

public health."   Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 472 (2001).   Most

importantly for the challenge here, in Algonquin, the Supreme Court found that section

232 "easily" met the intelligible principle standard because

> [i]t establishes clear preconditions to Presidential action[,] —[i]nter alia, a
> finding by the Secretary of the Treasury that an "article is being imported
> into the United States in such quantities or under such circumstances as to
> threaten to impair the national security." Moreover, the leeway that the
> statute gives the President in deciding what action to take in the event the
> preconditions are fulfilled is far from unbounded. The President can act only
> to the extent "he deems necessary to adjust the imports of such article and
> its derivatives so that such imports will not threaten to impair the national
> security." And §232(c),[4] [a]rticulates a series of specific factors to be

---

[4] Section 232 has been amended since the Supreme Court issued Algonquin.  Under the current
law, section 232(d) mirrors what was previously section 232(c) and section 232(c) enumerates
the President's authority, as was previously codified in section 232(b).  Section 232, substantively,
remains the same in relevant part.

> considered by the President in exercising his authority under § 232(b). In light of these factors and our recognition that "(n)ecessity . . . fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules . . . ," we see no looming problem of improper delegation.

Algonquin, 426 U.S. at 559–60 (citation and footnote omitted).  This court is bound by Algonquin.

Plaintiffs argue unpersuasively that Algonquin does not control because the plaintiffs in Algonquin "did not bring a facial challenge to the constitutionality of section 232," but rather challenged the President's statutory authority to impose a specific kind of remedy and argued for a narrow statutory construction to avoid a nondelegation problem. See Pls.' Br. at 31–33; Resp. Mem. Supp. Pls.' Opp'n Defs.' Mot. J. Pleadings & Reply Mem. Supp. Pls.' Mot. Summary J. at 4–7, Oct. 5, 2018, ECF No. 33 (Pls.' Reply Br."). This argument fails to carry the day, given that the parties in Algonquin argued the nondelegation issue, and the District Court for the District of Columbia and Supreme Court squarely addressed it.  The district court ruled that section 232 is "a valid delegation of authority by Congress to the President and confers upon him the power to impose import license fees on oil imports once he determines the fact of threatened impairment of the national security."  Algonquin SNG, Inc. v. Fed. Energy Admin., 518 F.2d 1051, 1063 (D.C. Cir. 1975) (Robb, J., dissenting) (attaching, in the Appendix, the U.S. District Court for the District of Columbia's opinion and order in this action stating that one thrust of the challenge is whether the proclamation at issue "is an unconstitutional delegation by Congress of legislative power").  Reversing the District Court, the U.S. Court of Appeals for the District of Columbia found that the President's license fee program was not

authorized by the statute, see id. at 1055, 1062. Thereafter, the Supreme Court squarely confronted the nondelegation challenge in response to the arguments put forth by parties in their briefs.  Algonquin, 426 U.S. at 559–60.

Plaintiffs also argue that Algonquin does not control because, since its issuance, "the legal landscape of judicial review of presidential decisions involving implementation of federal statutes has changed markedly[.]"  See Pls.' Br. at 29–30.  Specifically, Plaintiffs argue that the Supreme Court's decisions explaining that the President is not an agency and therefore not subject to review under the Administrative Procedure Act ("APA") undercut Algonquin's relevance.  See id. at 29–31 (citing Franklin v. Massachusetts, 505 U.S. 788 (1992); Dalton v. Specter, 511 U.S. 462 (1994)).  Thus, Plaintiffs premise their quest to overcome Algonquin on their view that the Supreme Court and all parties in Algonquin assumed a more searching standard of judicial review, see id. at 29–30, and that without the availability of such review, the standards articulated in section 232 must be considered anew to ascertain whether they meet the intelligible principle standard. See id. at 30–33, 42.

Plaintiffs' premise cannot withstand scrutiny.  Dalton and Franklin did not change "the legal landscape of judicial review" with respect to section 232.  See Pls.' Br. at 29– 30.  Indeed, no court before or after Algonquin held that the President was subject to the APA.  See 1 Kenneth Culp Davis, Administrative Law Treatise § 1.2 at 8 (2d ed. 1978); 1 Kristin E. Hickman & Richard J. Pierce, Jr., Administrative Law Treatise § 1.2.4 at 15 (6th ed. 2019); see also Franklin, 505 U.S. at 796, 800–01 (holding, definitively, that the

President is not subject to review under the APA).[5]  More importantly for purposes of this case, the APA did not expand judicial review to include review of matters committed to presidential discretion.  The Attorney General's Manual on the Administrative Procedure Act, considered an authoritative interpretation of the APA and entitled to deference, see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 546 (1978), makes clear that presidential determinations committed to the President's discretion by an enabling statute are not subject to review for rationality, findings of fact, or abuse of discretion.  See U.S. Dep't of Justice, Att'y Gen.'s Manual on the APA at 94–95 (1947) ("Manual") (noting, for example, that United States v. George S. Bush & Co., 310 U.S. 371 (1940), held that the President's actions under section 336(c) of the Tariff Act of 1930 were unreviewable because the statute left the determination to the President "if in his judgment" action was necessary); see also Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v. Connally, 337 F. Supp. 737, 760 (D.D.C. 1971) (Leventhal, J., for three-judge panel) (noting the rare occasions when Congress commits matters to executive discretion to avoid judicial review for errors of law and abuse of discretion).  In fact, Dalton acknowledged that prior decisions similarly found that matters committed to presidential discretion could not be reviewed for abuse of that discretion. Dalton, 511 U.S. at 474 (quoting Dakota Cent. Tel. Co. v. S.D. ex rel. Payne, 250 U.S.

---

[5] Courts had suggested, without deciding the question, that the APA applied to the President. See Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v. Connally, 337 F. Supp. 737, 761 (D.D.C. 1971) (Leventhal, J., for three-judge panel) (noting scholars who believed the President was an agency under the APA); DeRieux v. Five Smiths, Inc., 499 F.2d 1321, 1332 & n.13 (Temp. Emer. Ct. App. 1974) (relying on Amalgamated Meat Cutters to review an executive order and stating that the court's analysis assumed, for the sake of argument, "that the President is an agency within the meaning of the APA.").

163, 184 (1919), for the proposition that "where a claim 'concerns not a want of [presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power'"). Thus, prior to Dalton, and at the time of Algonquin, there was no judicial review of matters that Congress had committed to presidential discretion—such as those the President makes under section 232—for rationality, findings of fact, or abuse of discretion. See George S. Bush & Co., 310 U.S. at 379–80; 19 U.S.C. § 1862(c)(1)(A)(ii).[6] Instead, both before and after Algonquin, courts assessed presidential determinations committed to presidential discretion pursuant to nonstatutory review for being unconstitutional or in excess of statutorily granted authority.[7]

---

[6] Plaintiffs, perhaps unintentionally, touch upon this idea in their reply brief, stating that "even if there w[as] an express provision for judicial review, the courts would be assigned an impossible task." Pls.' Reply Br. at 20. Indeed, the task would be impossible not because Dalton and Franklin changed the legal landscape for judicial review of presidential action, but because section 232 commits requisite determinations to the President's discretion. See 19 U.S.C. § 1862(c). Judicial review was as much of an "impossible task" in Algonquin as it is here; neither Dalton nor Franklin made it any more or less practicable. The delegation of decision-making authority in section 232 existed at the time of Algonquin and the Supreme Court nonetheless found that it "easily fulfills" the nondelegation test. Algonquin, 426 U.S. at 559. This court is thus bound by Algonquin.

[7] In addition to establishing judicial power to review the constitutionality of statutes, Marbury v. Madison, 5 U.S. 137 (1803), demonstrated that courts can review the President's power under a statute and determine whether the President acted in excess of such statutory powers. This latter form of review has been described as nonstatutory review and is to be contrasted with the type of judicial review provided for by a specific statute, such as the APA. See Jonathan R. Siegel, Suing the President: Nonstatutory Review Revisited, 97 Colum. L. Rev. 1612, 1613–14 (1997) (discussing nonstatutory review). For example, in United States v. Yoshida International, Inc., 526 F.2d 560 (C.C.P.A. 1975), the Court of Customs and Patent Appeals ("CCPA") addressed whether Presidential Proclamation 4074 was within the President's delegated authority. Proclamation 4074 declared, inter alia, a national emergency related to the country's economic position, and assessed a supplemental duty of 10% on all dutiable products. Yoshida International, 526 F.2d at 567–68. Further, the proclamation authorized the President to, at any

(footnote continued)

Here, determinations pursuant to section 232 are committed to presidential discretion.  See 19 U.S.C. § 1862(c).  Section 232 empowers the President to either concur or not in the Secretary's finding as to whether an article under investigation constitutes a threat to national security and to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A)(i)–(ii).  The President's determination of whether to concur is not qualified by any language or standard, establishing that it is left to his discretion.  Accordingly, the President's determination as to the form of remedial action is a matter "in the judgment of the President[.]"  19 U.S.C. § 1862(c)(1)(A)(ii).  By committing the determinations of whether to concur with the Secretary and what remedial action to take, if any, to the judgment of the President, Congress precluded an inquiry for rationality, fact finding, or abuse of discretion.  See Manual at 94–96; George S. Bush &

_____

time, modify or terminate, in whole or in part, any proclamation made under his authority.  Id. at 568.  The CCPA held that although neither the Tariff Act of 1930 nor the Trade Expansion Act of 1962 authorized the proclamation, its adoption fell within the powers granted to the President under the Trading with the Enemy Act, i.e., to regulate or prohibit importation of goods during periods of war or national emergency.  Id. at 576.  The court reviewed the action not under the APA or any statute conferring judicial review but sought to answer the question of whether Proclamation 4074 was an ultra vires presidential act.  Id. at 583.

Likewise, U.S. Cane Sugar Refiners' Ass'n v. Block, 683 F.2d 399 (C.C.P.A. 1982), addressed whether the President acted within his delegated authority in issuing Proclamation 4941, which limited entry of sugar to a specific quantity between May 11, 1982, and June 30, 1982, and then to an amount as set by the Secretary of Agriculture.  Under section 201(a) of the Trade Expansion Act of 1962, the President could proclaim additional import restrictions as deemed appropriate to carry out a trade agreement entered pursuant to section 201 between June 30, 1962, and July 1,1967.  Id. at 401.  The CCPA upheld the President's action, holding that the Geneva Protocol of the General Agreement on Tariffs and Trade, which the President invoked in the proclamation, is a trade agreement for purposes of section 201, and thus the President's act was authorized by statute.  Id. at 402, 404.  Such reviews of presidential action demonstrate the availability of nonstatutory review separate and distinct from review under the APA.

Co., 310 U.S. at 379–80.  Notwithstanding Dalton and Franklin, because the statutory

language here commits determinations to the President's discretion, the review available

for presidential action has always been limited to constitutionality and action beyond

statutory authority.   Thus, there has been no change in the legal landscape since

Algonquin as far as section 232 is concerned.

Nonetheless, Plaintiffs ask the court to consider the broad authority given to the

President that triggers executive action, i.e., the "essentially unlimited definition of

national security," as well as the "limitless grant of discretionary remedial powers," as

indicative that the statute does not have an intelligible principle.  See Pls.' Br. at 5–6, 19–

20; see also 19 U.S.C. § 1862(c)–(d).   Plaintiffs emphasize the expansive options

available to the President to confront what he deems a national security issue.  See Pls.'

Br. at 6, 19–20.  Plaintiffs argue the President is only limited by his imagination, see id. at

20, and that the President could take any number of actions under the statute, including

> imposing tariffs on goods that are currently duty-free and increasing tariffs
> above those currently existing under the law for the subject article—with no
> limit on the level of the tariff. Thus, section 232 permits the President to
> impose tariffs—taxes—in unlimited amounts and of unlimited duration on
> any imported articles—or, as in the case with the steel tariff, on an entire
> class of imported articles.  The President may also impose quotas—whether
> or not there are existing quotas—and with no limit on how much a reduction
> from an existing quota (or present or historical level of imports) there can
> be for the subject article. In addition, the President could choose to impose
> licensing fees for the subject article, either in lieu of or in addition to any
> tariff or quota already in place. Conversely, the President may also reduce
> an existing tariff or increase a quota, whenever he concludes that such a
> reduction or increase is in the interest of national security, as elastically
> defined.  And for all these changes in the law, the President may select the
> duration of each such change without any limits on his choice, and he may
> make any changes with no advance notice or delay in implementation.

Pls.' Br. at 6.[8]  Admittedly, the broad guideposts of subsections (c) and (d) of section 232

bestow flexibility on the President and seem to invite the President to regulate commerce

by way of means reserved for Congress, leaving very few tools beyond his reach.  See

19 U.S.C. § 1862(c) (providing the President shall "determine the nature and duration of

the action that, in the judgment of the President, must be taken to adjust the imports of

the article and its derivatives so that such imports will not threaten to impair the national

security."), and 19 U.S.C. § 1862(d) (providing that the President shall take into

consideration "the close relation of the economic welfare of the Nation to our national

---

[8] Plaintiffs emphasize the range of actions available to the President under section 232 and reference specific acts that he has taken.  See Pls.' Br. at 12, 19–20; Pls.' Reply Br. at 5–6, 12–13.  For example, on March 8, 2018, the President issued Proclamation 9705 imposing a 25% tariff on all imported steel articles, other than those imported from Canada and Mexico.  See Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625 (Mar. 15, 2018).  The President also enacted Proclamation 9704 under section 232, which imposed a tariff of 10% on aluminum articles, other than those imported from Canada and Mexico.  See Proclamation 9704 of March 8, 2018, 83 Fed. Reg. 11,619 (Mar. 15, 2018).  Subsequently, the President issued several amendments to Proclamation 9705 under section 232, providing for various country-based exemptions from the steel tariff.  See Proclamation 9711 of March 22, 2018, 83 Fed. Reg. 13,361 (Mar. 28, 2018) (exempting, in addition to Canada and Mexico, the following countries from the steel tariff: the Commonwealth of Australia ("Australia"), the Argentine Republic ("Argentina"), the Republic of South Korea ("Korea"), the Federative Republic of Brazil ("Brazil"), and the European Union ("EU") on behalf of its member countries); Proclamation 9740 of April 30, 2018, 83 Fed. Reg. 20,683 (May 7, 2018) (announcing an agreement with Korea to impose a quota on Korean imports of steel articles into the United States, extending the temporary exemption from the steel tariff for Argentina, Australia, and Brazil, and extending the temporary exemption for Canada, Mexico, and the EU); Proclamation 9759 of May 31, 2018, 83 Fed. Reg. 25,857 (June 5, 2018) (announcing agreements to exempt on a long-term basis Argentina, Australia, and Brazil from the steel tariff announced in Proclamation 9705).  Plaintiffs also note the President is not required to apply his chosen remedy to imports from all countries but can pick and choose a remedy.  See Pls.' Br. at 7, 19–20.  Such discretion was recently demonstrated, Plaintiffs note, when the President doubled the tariff on steel imports from Turkey with no national security justification beyond that which is applicable to steel imports from other countries.  See Proclamation 9772 of August 10, 2018, 83 Fed. Reg. 40,429 (Aug. 15, 2018) (raising the steel tariff to 50% for Turkey); see also Pls.' Reply Br. at 12 (reproducing the proclamation as Exhibit 15 to Supp. Mem. Supp. Pls.' Mot. Summary J., Aug. 16, 2018, ECF No. 24).

security, . . . any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports . . . , without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.").

To be sure, section 232 regulation plainly unrelated to national security would be, in theory, reviewable as action in excess of the President's section 232 authority.  See, e.g., Indep. Gasoline Marketers Council, Inc. v. Duncan, 492 F. Supp. 614, 620 (D.D.C. 1980) (holding that the President's imposition of a gasoline "conservation fee" pursuant to section 232(b) of the Trade Expansion Act was not authorized by the statute). However, identifying the line between regulation of trade in furtherance of national security and an impermissible encroachment into the role of Congress could be elusive in some cases because judicial review would allow neither an inquiry into the President's motives nor a review of his fact-finding.  See George S. Bush & Co., 310 U.S. at 379–80; Florsheim Shoe Co. v. U.S., 744 F.2d 787, 796–97 (Fed. Cir. 1984).  One might argue that the statute allows for a gray area where the President could invoke the statute to act in a manner constitutionally reserved for Congress but not objectively outside the President's statutory authority, and the scope of review would preclude the uncovering of such a truth.  Nevertheless, such concerns are beyond this court's power to address, given the Supreme Court's decision in Algonquin, 426 U.S. at 558–60.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment is denied,

and the Defendants' motion for judgment on the pleadings is granted.  Judgment will enter

accordingly.

                                                           /s/ Claire R. Kelly
                                                          Claire R. Kelly, Judge


                                                           /s/ Jennifer Choe-Groves
                                                          Jennifer Choe-Groves, Judge

Dated:  March 25, 2019
            New York, New York


Katzmann, Judge, <u>dubitante</u>.[1]  Section 232 of the Trade Expansion Act of 1962,

<u>as amended in</u> 19 U.S.C. § 1862 (2012) ("section 232"), provides that if the Secretary of

---

[1] "[E]xpressing the epitome of the common law spirit, there is the opinion entered <u>dubitante</u> – the judge is unhappy about some aspect of the decision rendered, but cannot quite bring himself to record an open dissent."  Lon Fuller, <u>Anatomy of the Law</u> 147 (1968).  <u>See generally</u> Jason Czarnezki, <u>The Dubitante Opinion</u>, 39 Akron L. Rev. 1 (2006).

The <u>dubitante</u> opinion has a well-established place in American jurisprudence.  <u>See, e.g.</u>, <u>Radio Corp. of America v. United States</u>, 341 U.S. 412, 421 (1951) (Frankfurter, J., <u>dubitante</u>) ("Since I am not alone in entertaining doubts about this case they had better be stated."); <u>O'Keefe v. Smith, Hinchman & Grylls Associates</u>, 380 U.S. 359, 371–72 (1965) (Douglas, J., <u>dubitante</u>) ("I would not be inclined to reverse a Court of Appeals that disagreed with . . . findings as exotic as we have here."); <u>Kartell v. Blue Shield of Mass., Inc.</u>, 592 F.2d 1191, 1195–96 (1st Cir. 1979) (Coffin, C.J., <u>dubitante</u>) ("While I share the court's desire to defer to Massachusetts courts for all the help we can get . . . I confess to some uneasiness about our privilege as an appellate court simply to abstain when the district court has not seen fit to do so . . . I hope the court is correct."); <u>Feldman v. Allegheny Airlines, Inc.</u>, 524 F.2d 384, 393 (2d Cir. 1975) (Friendly, J., concurring <u>dubitante</u>) ("Although intuition tells me that the Supreme Court of Connecticut would not sustain the award made here, I cannot prove it.  I therefore go along with the majority, although with the gravest doubts."); <u>Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP</u>, 684 F.3d 1364, 1374 (Fed. Cir. 2012) (Reyna, J., <u>dubitante</u>) ("As I cannot prove or disprove our result, I go along with the majority – but with doubt.").

                                                                                      (footnote continued)

Commerce finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."

Section 232 was enacted pursuant to the power granted exclusively to Congress by Article I, Section 8 of the Constitution, which provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises," as well as "To regulate Commerce with foreign Nations." There is no provision in the Constitution that vests in the President the same "Power To Lay and collect . . . Duties." In short, the power to impose duties is a core legislative function.

---

The dubitante opinion has also been issued where -- as I do in the case before us now -- a judge considers himself or herself to be constrained or bound by precedent, but wishes to suggest an alternative view. See., e.g., Weaver v. Marine Bank, 683 F.2d 744, 749 (3rd Cir. 1982) (Sloviter, J., dubitante) ("With great deference to my colleagues on the court when the [precedential] decision was rendered, it appears to rest on a misapprehension and misapplication of the Supreme Court's decision."); United States v. Jeffries, 692 F.3d 473, 483 (6th Cir. 2012) (Sutton, J., dubitante) ("Sixth Circuit precedent compels this interpretation of § 875(c) . . . I write separately because I wonder whether our initial decisions in this area (and those of other courts) have read the statute the right way from the outset."); PETA v. U.S. Dept. of Agriculture, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante) ("If the slate were clean, I would feel obligated to dissent from the majority's standing decision. But I am afraid that the slate has been written upon, and this court's . . . precedent will not let me extricate this case from its grasp."); Brenndoerfer v. U.S. Postal Service, 693 Fed.Appx. 904, 906–07 (Fed. Cir. 2017) (Wallach, J., concurring dubitante) ("Because I am bound by our precedent, I agree with the majority that [Petitioner's] petition must be dismissed for lack of subject matter jurisdiction. However, I reiterate that '[i]t may be time' [to revisit the issue] in 'light of recent Supreme Court precedent.'" (citations omitted)).

On March 18, 2018, after receiving the report of the Secretary of Commerce, the President, invoking section 232, issued two proclamations imposing tariffs of 25% on steel and 10% on aluminum imports effective March 23, 2018,[2] while providing for flexibility with regard to country and product applicability of the tariffs.   The new tariffs were to be imposed in addition to duties already in place, including antidumping and countervailing duties under domestic laws designed to preserve fair trade for the American economy.[3] It appears that the March 18, 2018 proclamations were the first presidential actions based on section 232 in more than thirty years.[4]

The question before us may be framed as follows: Does section 232, in violation of the separation of powers, transfer to the President, in his virtually unbridled discretion,

---

[2] Proclamation 9704 of March 8, 2018, 83 Fed. Reg. 11,619 (Mar. 15, 2018) amended in Proclamation 9776 of August 29, 2018, 83 Fed. Reg. 45,019 (Sept. 4, 2018) and Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625 (Mar. 15, 2018) amended in Proclamation 9777 of August 29, 2018, 83 Fed. Reg. 45,025 (Sept. 4, 2018).

[3] "Dumping occurs when a foreign company sells a product in the United States at a lower price than what it sells that same product for in its home market.  Such a product can be described as being sold below 'fair value.'"  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  "[A] countervailable subsidy exists where a foreign government provides a financial contribution which confers a benefit to the recipient."  ATC Tires Private Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366–67 (2018).  To empower the Department of Commerce ("Commerce") to offset harmful economic distortions caused by countervailable subsidies and dumping, Congress enacted the Tariff Act of 1930.  Sioux Honey, 672 F.3d at 1046.  Under the Tariff Act's framework, Commerce may investigate potential countervailable subsidies or dumping and, if appropriate, issue orders imposing duties on the merchandise under investigation.  19 U.S.C. §§ 1671, 1673; see also Sioux Honey, 672 F.3d at 1046; ATC Tires, 322 F. Supp. 3d at 1366–67.

[4] The Congressional Research Service has reported in a study that "[p]rior to the [current] Administration, a President arguably last acted under Section 232 in 1986.  In that case, Commerce determined that imports of metal-cutting and metal-forming machine tools threatened to impair national security. . . .  [T]he President sought voluntary export restraint agreements with leading foreign exporters, and developed domestic programs to revitalize the U.S. industry."  Cong. Research Serv., R45249, Section 232 Investigations: Overview and Issues for Congress 4 (2018).

the power to impose taxes and duties that is fundamentally reserved to Congress by the

Constitution?  My colleagues, relying largely on a 1976 Supreme Court decision, conclude

that the statute passes constitutional muster.  While acknowledging the binding force of

that decision, with the benefit of the fullness of time and the clarifying understanding borne

of recent actions, I have grave doubts.  I write, respectfully, to set forth my concerns.

It was the genius of the Framers of the Constitution of this Nation, forged from the

struggle against tyranny, that they declared the essential importance of the separation of

the powers.[5]  In The Federalist No. 47, James Madison wrote that "[n]o political truth is

certainly of greater intrinsic value, or is stamped with the authority of more enlightened

patrons of liberty than" the separation of powers.  The Federalist No. 47, at 301 (James

Madison) (Clinton Rossiter ed., 1961).  "The accumulation of all powers, legislative,

executive and judiciary in the same hands . . . must justly be pronounced the very

definition of tyranny."  Id.  Although the Constitution does not have an explicit provision

recognizing the separation of powers, the Constitution does identify three distinct types

of governmental power -- legislative, executive and judicial -- and, in the Vesting Clauses,

commits them to three distinct branches of Government.  Those clauses provide that "[a]ll

legislative Powers herein granted shall be vested in a Congress of the United States,

which shall consist of a Senate and House of Representatives," U.S. Const. art. I, § 1;

"[t]he executive Power shall be vested in a President of the United States," U.S. Const.

art. II, § 1, cl. 1; and "[t]he judicial Power of the United States[] shall be vested in one

---

[5] See generally M.J.C. Vile, Constitutionalism and the Separation of Powers, 156–175 (1967) (reprinted in 1969); Keith E. Whittington & Jason Iuliano, The Myth of the Nondelegation Doctrine, 165 U. Pa. L. Rev. 379 (2017).

supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," U.S. Const. art. III, § 1.  Insofar as the Constitution departs from a pure separation of powers model and allows some sharing of powers across the branches of government, those exceptions are set out in text.  The President is given a share of the legislative power through the prerogative of the presidential veto.  U.S. Const. art. I, § 7.  The Senate is given a share of the executive power through the right to advise and consent to the appointment of government officers.  U.S. Const. art. II, § 2.

A review of Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive.  Indeed, the first case raising the question of unconstitutional delegation of legislative power was a trade case, <u>Cargo of the Brig Aurora v. United States</u>, 11 U.S. (7 Cranch) 382, 382–85 (1813).  That case involved the condemnation and seizure of cargo of the brig Aurora in the Port of New Orleans, imported from Great Britain in violation of the Non-Intercourse Act of 1809 ("1809 Act").  Ch. 242, 2 Stat. 528 (1809).  The 1809 Act, which sought to keep the United States from entanglement in the war between Britain and France by forbidding the importation of goods from either of those nations, had authorized the President to lift the embargo upon his declaration that either of those nations had ceased to violate the neutral commerce of the United States.  <u>Id.</u>  When the 1809 Act expired, the Non-Intercourse Act of 1810 extended its terms but temporarily suspended its implementation to permit each of the two warring nations an opportunity to renounce her policies against American shipping and to announce respect for American neutrality.

The President was again authorized to lift the embargo upon declaration by proclamation that the nation had "cease[d] to violate the neutral commerce of the United States." Cargo of the Brig Aurora, 11 U.S. at 384.  The President issued a proclamation declaring that France had revoked her edicts such that she was now respectful of America's neutral commerce, thus lifting the embargo against France.  Id.  The President, however, determined that Britain had not modified its offending edicts, and thus the embargo against her remained in place.  Id.  Counsel for the owner of the cargo contended that Congress had impermissibly "transfer[red] the legislative power to the President" and that Congress could not enact legislation which predicated the revival of an expired law upon a proclamation by the President attesting to facts as articulated by Congress.  Id. at 386. In rejecting this argument and upholding the act, the Court ruled that it could "see no sufficient reason[] why the legislature should not exercise it discretion in reviving the act, . . . either expressly or conditionally, as their judgment should direct . . . upon the occurrence of any subsequent combination of events."  Id. at 388.  In other words, the law was constitutional because the President was acting as a fact-finder, not a lawmaker.

By the time the Supreme Court addressed its next nondelegation challenge in a trade case, Field v. Clark, 143 U.S. 649 (1892), it had previously observed that "[t]he line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details."  Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 20 (1825). In the 1892 case, Field, supra, importers brought a suit claiming that duties imposed

pursuant to the Tariff Act of 1890 should be refunded because that act was an

unconstitutional delegation of legislative power.  The Tariff Act of 1890 provided:

> That with a view to secure reciprocal trade with countries producing
> [specified] articles . . . whenever, and so often as the [P]resident shall be
> satisfied that the [G]overnment of any country producing . . . such articles,
> imposes duties or other exactions upon the agricultural or other products of
> the United States, which in view of the free introduction of …[such articles]
> into the United States he may deem to be reciprocally unequal and
> unreasonable, he shall have the power and it shall be his duty to suspend,
> by proclamation to that effect, the provisions of this act relating to the free
> introduction of [such articles] . . . for such time as he shall deem just, and in
> such case and during such suspension duties shall be levied, collected, and
> paid upon [such articles] . . . .

Field, 143 U.S. at 697–98.   In rejecting the claim that the Tariff Act of 1890

unconstitutionally delegated legislative power to the President, the Court stated:

> That Congress cannot delegate legislative power to the [P]resident is a
> principle universally recognized as vital to the integrity and maintenance of
> the system of government ordained by the Constitution.   The [A]ct of
> October 1, 1890, in the particular under consideration, is not inconsistent
> with that principle.  It does not, in any real sense, invest the [P]resident with
> the power of legislation. . . .   Congress itself prescribed, in advance, the
> duties to be levied, collected and paid . . .while the suspension lasted.
> Nothing involving the expediency or the just operation of such legislation
> was left to the determination of the [P]resident. . . . But when he ascertained
> the fact that duties and exactions, reciprocally unequal and unreasonable,
> were imposed upon the agricultural or other products of the United States
> by a country producing and exporting sugar, molasses, coffee, tea or hides,
> it became his duty to issue a proclamation declaring the suspension, as to
> that country, which [C]ongress had determined should occur.  He had no
> discretion in the premises except in respect to the duration of the
> suspension so ordered.  But that related only to the enforcement of the
> policy established by [C]ongress.  As the suspension was absolutely
> required when the [P]resident ascertained the existence of a particular fact,
> it cannot be said that in ascertaining that fact, and in issuing his
> proclamation, in obedience to the legislative will, he exercised the function
> of making laws.

Id. at 692–93.

The next case adjudicating a challenge to a trade statute on the grounds of unconstitutional delegation of legislative power to the President was J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394 (1928).  An importer of barium dioxide challenged the tariff assessed on a shipment by virtue of the "flexible tariff provision" of the Tariff Act of 1922, enacted:

> to secure by law the imposition of customs duties on articles of imported merchandise which should equal the difference between the cost of producing in a foreign country the articles in question and laying them down for sale in the United States, and the cost of producing and selling like or similar articles in the United States, so that the duties not only secure revenue, but at the same time enable domestic producers to compete on terms of equality with foreign producers in the markets of the United States.

Id. at 404.  In that provision, Congress authorized the President to adjust the duties set by the statute if the President determined after investigation that the duty did not "equalize . . . differences in costs of production in the United States and the principal competing country . . . .  Provided, [t]hat the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified" by statute.  Id. at 401.  Noting that the "difference which is sought in the statute is perfectly clear and perfectly intelligible," the Court also observed that it was difficult for Congress to fix the rates in the statute.  Id. at 404.  Accordingly, the Tariff Commission was assigned to "assist in . . . obtaining needed data and ascertaining the facts justifying readjustments," to "make an investigation and in doing so must give notice to all parties interested and an opportunity to adduce evidence and to be heard."  Id.  The President would then "proceed to pursue his duties under the [A]ct and reach such conclusion as he might find justified by the investigation[,] and to proclaim the same, if necessary."  Id. at 405.

Noting that the Federal Constitution "divide[s] the governmental power into three branches," the Hampton Court stated that "it is a breach of the national fundamental law if Congress gives up its legislative powers and transfers it to the President . . . ." Id. at 406.  However, Congress could "invoke the action" of the Executive "in so far as the action invoked shall not be an assumption of the constitutional field of action of [the Legislative] branch."  Id.  "[I]n determining what it may do in seeking assistance from [the Executive], the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."  Id.  Then the Hampton court announced what has come to be known as the "intelligible principle" formulation: "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."  Id. at 409.  Citing to Field, supra, the Court pointed to the limited and circumscribed nature of the Executive action, concluding the President was:

> not in any real sense invest[ed] . . . with the power of legislation, because nothing involving the expediency or just operation of such legislation was left to the determination of the President; that the legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency.

Id. at 410.  The President "was the mere agent of the law-making department."  Id. at 411.  "What the President was required to do was merely in execution of the act of Congress."  Id. at 410–11.

The "intelligible principle" standard is the standard which has since been applied to determine whether there has been an impermissible delegation of legislative power. As my colleagues note, in the years since the "intelligible principle" was announced, and in cases involving numerous statutes, only twice has the Court invalidated a statute because it impermissibly delegated the power vested in the Congress to the Executive. "In the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 474 (2001) (citing Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) and A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935)).  Since 1935, the Court has never invalidated a statute because of impermissible delegation of legislative power to the Executive.  This deference "is a reflection of the necessities of modern legislation dealing with complex economic and social problems. . . . Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules."  American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946).

In the one trade case before the Court since Hampton where it was contended that the statute at issue constituted an unconstitutional delegation of legislative power to the Executive, the statute in question was the one before us now -- section 232.  See Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548 (1976).  In that case -- after a determination that foreign petroleum was being imported into the United States in such

quantities and at such low costs as to threaten to impair national security by inhibiting the development of domestic production and refinery capacity -- the President imposed license fees upon the exporters in an effort to control imports pursuant to section 232. The Attorney General of the Commonwealth of Massachusetts and others brought suit, primarily making the narrow statutory claim that while section 232 authorized the President to adjust the imports of petroleum and petroleum products by imposing quotas, the remedy that the President sought, import licensing fees, was not authorized by the statute.  Id. at 556.  They also argued that unless this construction was adopted, the Court would have to reach the constitutional question of whether section 232 was an impermissible delegation of legislative power to the President.  Id. at 558–59.  The Supreme Court opinion, as my colleagues note, not only decided (in favor the Federal Energy Administration) the statutory question as to whether licenses were permissible, but also reached the constitutional question.  Referencing the "intelligible principle," the Court ruled that "[e]ven if § 232(b) is read to authorize the imposition of a license fee system, the standards that it provides the President in its implementation are clearly sufficient to meet any delegation doctrine attack."  Id. at 559.

Of course, as a lower court, it behooves us to follow the decision of the highest court.  It can also be observed that new developments and the record of history may supplement and inform our understanding of law.  Indeed, the Algonquin court concluded with the following:

> Our holding today is a limited one.  As respondents themselves acknowledge, a license fee as much as a quota has its initial and direct impact on imports, albeit on their price as opposed to their quantity.  As a consequence, our conclusion here, fully supported by the relevant

legislative history, that the imposition of a license fee is authorized by § 232(b) in no way compels the further conclusion that <u>any</u> action the President might take, as long as it has even a remote impact on imports, is also so authorized.

<u>Id.</u> at 571 (emphasis in original).

Analyzing the delegation question from the face of the statute, the <u>Algonquin</u> court took note of "clear conditions to Presidential action" that established an intelligible principle restricting presidential action: The Secretary is required to make a finding that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." <u>Id.</u> at 559. "The President can act only to the extent 'he deems necessary to adjust the imports of such article and its derivative so that such imports will not threaten to impair the national security.' And § 232(c) articulates a series of specific factors to be considered by the President in exercising his authority under § 232(b)." <u>Id.</u> at 559. While section 232 states as the Court recited, there is no statutory requirement that the President's actions match the Secretary's report or recommendations. The President is not bound in any way by any recommendations made by the Secretary, and he is not required to base his remedy on the report or the information provided to the Secretary through any public hearing or submission of public comments. There is no rationale provided for how a tariff of 25% was derived in some situations, and 10% in others. There is no guidance provided on the remedies to be undertaken in relation to the expansive definition of "national security" in the statute – a definition so broad that it not only includes national defense but also encompasses the entire national economy. The record reveals, for example, that the

Secretary of Defense stated that "the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production."[6]

As the preceding review of the trilogy of <u>Aurora</u>, <u>Field</u>, and <u>Hampton</u> evinces, the trade statutes in those cases did not impermissibly transfer the legislative function to the Executive because they provided ascertainable standards to guide the President – standards such that the congressional will had been articulated and was thus capable of effectuation.  What we have come to learn is that section 232, however, provides virtually unbridled discretion to the President with respect to the power over trade that is reserved by the Constitution to Congress.  Nor does the statute require congressional approval of any presidential actions that fall within its scope.[7]  In short, it is difficult to escape the conclusion that the statute has permitted the transfer of power to the President in violation of the separation of powers.

To note these concerns is not to diminish in any way the reality, sanctioned under established constitutional principles, that in the workings of an increasingly complex world, Congress may assign responsibilities to the Executive to carry out and implement its policy.  Nor is it to ignore the flexibility that can be allowed the President in the conduct of foreign affairs.  <u>See</u> <u>United States v. Curtiss-Wright Export Corp</u>, 299 U.S. 304 (1936).  However, that power is also not unbounded, even in times of crisis.  <u>See</u> <u>Hamdi v.</u>

---

[6]  Letter from James N. Mattis, Secretary of Defense, to Wilbur L. Ross Jr., Secretary of Commerce (2018), Pl.'s Mot. for Summary J. (July 19, 2018) at Exh. 8, ECF No. 20-7.

[7]  Compare the Crude Oil Windfall Profit Tax Act of 1980, creating a joint disapproval resolution provision under which Congress can override presidential actions in the case of adjustments to petroleum or petroleum product imports).  The Crude Oil Windfall Profit Tax Act of 1980, § 402, Pub. L. 96-223, 19 U.S.C. § 1962, 94 Stat. 229, <u>repealed by</u> Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107, 1322.

Rumsfeld, 542 U.S. 507, 536 (2004) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).[8]

In the end, I conclude that, as my colleagues hold, we are bound by Algonquin, and thus I am constrained to join the judgment entered today denying the Plaintiffs' motion and granting the Defendants' motion. I respectfully suggest, however, that the fullness of time can inform understanding that may not have been available more than forty years ago. We deal now with real recent actions, not hypothetical ones. Certainly, those actions might provide an empirical basis to revisit assumptions. If the delegation permitted by section 232, as now revealed, does not constitute excessive delegation in violation of the Constitution, what would?

/s/ Gary S. Katzmann
Gary S. Katzmann, Judge

---

[8] Regarding the interplay between the Constitution and statute, one commentator has observed:

> The Constitution grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises" and "To regulate Commerce with foreign Nations." The president has no similar grant of substantive authority over economic policy, international or domestic. Consequently, international trade policy differs substantially from other foreign affairs issues, such as war powers, where the president shares constitutional authority with Congress. Where international trade policy is concerned, the president's authority is almost entirely statutory.

Timothy Meyer, Trade, Redistribution, and the Imperial Presidency, 44 Yale J. Int'l L. Online 16 (2018) (footnotes omitted) available at http://www.yjil.yale.edu/features-symposium-international-trade-in-the-trump-era/.